**ROSS–SIMONS OF WARWICK, INC., Ross–Simons, Inc., Ross–Simons of Barrington, Inc., Ross–Simons of Atlanta, L.L.C., and Ross–Simons of North Carolina, L.L.C., Plaintiffs,**

v.

**BACCARAT, INC., Defendant.**

No. 96–062L.

United States District Court, D. Rhode Island.

Sept. 29, 1998.

---

Steven E. Snow, Partridge Snow & Hahn, Thomas R. Noel, Providence, RI, for Plaintiffs.

John H. Blish, Joseph V. Cavanaugh, Jr., Blish & Cavanaugh, Providence, RI, Jefffrey A. Oppenheim, Kane Kessler, P.C., New York City, for Defendants.

### OPINION AND ORDER

LAGUEUX, Chief Judge.

Plaintiffs ("Ross–Simons") seek damages for alleged breach of contract and related claims arising out of a 1992 agreement. Two motions by defendant ("Baccarat") are now before the Court: a motion for summary judgment as to all counts of plaintiffs' Amended Complaint and a motion to dismiss, or in the alternative, to strike plaintiffs' claims for punitive damages and Count VI of the Amended Complaint. For the reasons stated below, defendant's motion for summary judgment is denied, defendant's motion to dismiss plaintiffs' claims for punitive damages is granted in part, and defendant's motion to dismiss Count VI of the Amended Complaint is granted.

### BACKGROUND

Plaintiffs are retailers of jewelry, tableware, giftware, crystal, and similar items with stores in Rhode Island, North Carolina, and Georgia. Catalog and telemarketing sales, however, account for approximately eighty-five percent of Ross–Simons' total sales, with approximately 45 million catalogs distributed annually. The catalog and telemarketing sales are coordinated through a distribution center in Cranston, Rhode Island.

Ross–Simons is a substantial national retailer of items such as china and crystal, ranking among the national leaders in sales volume for these products and generating $150 million annually in total sales from all operations. Nearly all of Ross–Simons' sales are at prices below suggested retail prices, with discounts often reaching fifty percent. An important aspect of Ross–Simons' sales strategy is the development of a large bridal registry actively promoted by the firm. Each year the program attracts approximately 15,000 new registrants. This business is important to Ross–Simons because each new registration is likely to result in multiple purchases on behalf of the registered couple.

Defendant is the United States subsidiary of Companie des Cristalleries de Baccarat and the exclusive United States distributor of the world-renowned French lead crystal produced by Compagnie des Cristalleries de Baccarat. Prior to 1992, Baccarat refused to sell crystal to Ross–Simons, asserting the philosophy that luxury items such as Baccarat crystal are not appropriate for discounting. Furthermore, when Baccarat became the exclusive distributor of Haviland Limoges china in 1991, it terminated Ross–Simons' status as an authorized dealer of the china.

In January 1992, Ross–Simons filed a civil action against Baccarat in the United States District Court for the District of Rhode Island alleging violations of federal and state antitrust statutes. That case was assigned to this writer. In its antitrust suit, Ross–Simons alleged that Baccarat had improperly refused to deal with Ross–Simons because Baccarat disapproved of Ross–Simons' discounting and catalog sales practices.

Prior to a hearing of the antitrust suit on its merits, the parties settled their differences. On November 24, 1992, they executed a written agreement, labeled "Agreement of Compromise and Settlement" ("1992 Agreement"), intended to resolve the conflict underlying the antitrust suit. This Agreement was never presented to the Court for approval or for inclusion in a final judgment.

According to its own terms, the 1992 Agreement was designed to be "a compromise between the parties for the settlement of their claims, differences and causes of action." In Section Two thereof, the antitrust suit brought by Ross–Simons was referenced. Ross–Simons alleged a concerted refusal to deal by Baccarat and two other porcelain dinnerware suppliers and a horizontal agreement regarding pricing between the three suppliers. This Section concluded by explaining that Ross–Simons and Baccarat "desire to reach a compromise and settlement of the aforementioned legal action."

The substance of the 1992 Agreement was contained in Section Three (entitled "Terms of Settlement"), which enumerated the respective obligations of the parties under the settlement. The writing describes these obligations as "mutual covenants." According to the compromise, Ross–Simons agreed to dismiss its antitrust suit. The parties agreed that such dismissal would be without prejudice and that each party would bear its own costs and legal expenses. In exchange for this dismissal, Baccarat accepted several duties.

First, Baccarat agreed to reinstate Ross–Simons as an authorized dealer of Haviland Limoges porcelain dinnerware, to appoint Ross–Simons as an authorized dealer of Raynaud Ceralene Limoges porcelain dinnerware, and to appoint Ross–Simons as an authorized dealer of Baccarat crystal. For each line of goods, Baccarat promised that Ross–Simons would be "entitled to purchase and resell such products at such prices and upon such terms as are available to other authorized dealers."

Second, Baccarat promised to "not terminate Ross–Simons' status as an authorized dealer, nor otherwise discriminate against Ross–Simons in any manner" because of Ross–Simons' discount pricing policies. Baccarat further agreed that it would not discriminate against Ross–Simons' applications for authorization of additional stores, but would "consider all applications ... under the same standards generally applied to other authorized dealers."

The 1992 Agreement states no durational term. It does, however, purport to bind and benefit "the parties and their respective legal representatives, successors and assigns." In addition, the compromise agreement expressly disclaims any power of a party to terminate or rescind the agreement based on a change of facts.

Following the execution of the 1992 Agreement, the parties cordially maintained a sizable business relationship. During this period, Ross–Simons grossed approximately $1 million annually in Baccarat crystal sales. The dynamics of that relationship changed, however, when Jean–Luc Negre assumed the presidency of Baccarat in 1994. Negre replaced Francois de Montmorin, the Baccarat president who executed the 1992 Agreement on Baccarat's behalf.

At an October 31, 1994 meeting with Darrell Ross, the president of Ross–Simons, Negre expressed his belief that discounting was an inappropriate method of selling luxury items like Baccarat crystal. Ross–Simons became further concerned in the summer of 1995 when Baccarat refused to grant authorized dealer status to a new Ross–Simons retail store in Raleigh, North Carolina. Baccarat explained to Ross–Simons at the time that no new dealerships were being granted pending the development of a new authorized dealer program and agreement. Ross–Simons alleges that a Baccarat official had previously agreed to authorize the Raleigh store and that Baccarat authorized two new dealerships for other retailers late in the summer of 1994 despite the moratorium explained to Ross–Simons.

The deterioration of the relationship accelerated in the fall of 1995 when Negre initiated a new program for appointing authorized Baccarat dealers. On October 17, 1995, Negre announced the "Authorized Dealer Program," aimed at "enhancing the overall image and prestige throughout the United States of [Baccarat's] world renowned name."

At the center of this new initiative was a proposed "Authorized Dealer Agreement" ("Proposed Agreement"). In his letter to Ross–Simons, Negre instructed that to be considered for designation as an authorized dealer for 1996, dealers were required to execute and return the Proposed Agreement

by December 15, 1995. Contained within the Proposed Agreement were several provisions that Ross–Simons deemed inimical to their discount pricing business. In effect, the Proposed Agreement required that Ross–Simons abandon its discount pricing strategy. It prohibited the advertising of Baccarat products in catalogs that devote more than twenty-five percent of their space to off-price advertising. The Proposed Agreement also granted Baccarat the power to terminate a dealership if it found, in its sole discretion, that the dealer was acting in a way that was "damaging to the prestige, image and goodwill associated with Baccarat products." Given Ross–Simons' practice of devoting nearly all of the space in its catalogs to discounted items and Negre's philosophical opposition to discounting luxury items, the Proposed Agreement was viewed by Ross–Simons management as a "suicide note."

Ross–Simons expressed to Baccarat its concerns with the Proposed Agreement and asserted that the 1992 Agreement guaranteed Ross–Simons the right to continue selling Baccarat products according to its off-pricing strategy. Baccarat disagreed, asserting that the 1992 Agreement required Baccarat to treat Ross–Simons in the same manner as it treated all other dealers. Baccarat claimed that the Proposed Agreement was a standard dealership proposal offered to all authorized dealers on equal terms. Baccarat refused to modify the Proposed Agreement to suit Ross–Simons, so Ross–Simons refused to sign it. On January 23, 1996, a Baccarat official informed Ross–Simons that effective January 1, 1996, Baccarat would no longer fill Ross–Simons' orders.

Ross–Simons responded to Baccarat's refusal to fill orders by filing a suit in Rhode Island Superior Court alleging, inter alia, breach of the 1992 Agreement. Baccarat removed the case to this Court. See 28 U.S.C. § 1332(a)(1) (diversity jurisdiction), 1441 (allowing removal of cases where diversity is the basis of jurisdiction). The case was assigned to Senior Judge Boyle. After conducting an evidentiary hearing, he granted Ross–Simons' request for a preliminary injunction compelling Baccarat to continue dealing with Ross–Simons according to the terms of the 1992 Agreement. Baccarat appealed to the United States Court of Appeals for the First Circuit, but the preliminary injunction order was affirmed. See Ross–Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 13 (1st Cir.1996). The Court of Appeals held that Judge Boyle had not committed an abuse of discretion in concluding that Ross–Simons would suffer irreparable harm in the absence of a preliminary injunction, that Baccarat would suffer little harm by continuing to deal with Ross–Simons pendente lite, and that Ross–Simons would likely prevail on the merits of the suit. See id. at 16–20. After remand, the case was again assigned to Judge Boyle, but when he retired, the matter was assigned to this writer.

The Amended Complaint contains six counts. Counts I and II allege breach of contract. In Count I, Ross–Simons alleges that Baccarat breached the 1992 Agreement by terminating Ross–Simons' status as an authorized dealer. In Count II, Ross–Simons alleges that Baccarat breached the 1992 Agreement by refusing to grant Ross–Simons authorization to sell Baccarat products at new store locations. Count III alleges breach of the implied covenant of good faith and fair dealing in the 1992 Agreement as a result of Baccarat's allegedly discriminatory conduct. Count IV alleges tortious interference by Baccarat with Ross–Simons' business relationships with its customers. Count V seeks a permanent injunction prohibiting discriminatory treatment of Ross–Simons. In each of these counts, except the count requesting injunctive relief, Ross–Simons seeks nominal and punitive damages, but no compensatory damages. Plaintiffs allege that while they have suffered real harm from Baccarat's conduct, they are unable to quantify the damage.

The final count upon which plaintiffs seek punitive damages, Count VI, is entitled: "Continuing Breaches and Tortious Conduct; Violations of This Court's Order of Preliminary Injunction." In this count, Ross–Simons alleges that Baccarat continued to discriminate against Ross–Simons in violation of this Court's Preliminary Injunction order prohibiting such discriminatory treatment. Ross–Simons details several instances of con-

duct by Baccarat which are alleged to be both discriminatory and harmful to Ross–Simons' business, such as a refusal by defendant to meet with Ross–Simons' officials at a trade show and denial by defendant of Ross–Simons' status as an authorized dealer when asked by potential customers. The matter is now before this Court on defendant's motion for summary judgment and defendant's motion to dismiss or strike. Each motion will be addressed in turn.

## DISCUSSION

### I. Motion for Summary Judgment

#### A. Standard of Law for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party. *See Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). However, a grant of summary judgment "is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I.1991). Summary judgement is only available when there is no dispute as to any material fact and only questions of law remain. *See Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996). Additionally, the moving party bears the burden of showing that no evidence supports the nonmoving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Plaintiffs' Complaint

The claims in Ross–Simons' suit are anchored in the 1992 Agreement. The Amended Complaint alleges that Baccarat violated the terms of the 1992 Agreement by two specific acts. First, Ross–Simons claims that the Proposed Agreement was a mere pretext for allowing Baccarat to discriminate against Ross–Simons because of its discount and catalog sales practices. According to Ross–Simons, the 1992 Agreement prohibits Baccarat from terminating their business relationship because of Ross–Simons' sales strategies. Ross–Simons argues that the Proposed Agreement would allow Baccarat to terminate Ross–Simons for selling Baccarat products through discount price catalogs, the very practice protected by the 1992 Agreement. It is claimed that Baccarat's refusal to deal without Ross–Simons' acquiescence in the new program constitutes a breach of the 1992 Agreement.

Second, Ross–Simons argues that the "non-discrimination" provisions of the 1992 Agreement prohibit Baccarat from denying an application by Ross–Simons for an additional authorized dealership location based on Baccarat's disapproval of Ross–Simons' policies. Failure to approve of the new Raleigh, North Carolina store constituted a breach of this provision of the 1992 Agreement according to Ross–Simons.

The Amended Complaint alleges that Baccarat's actions also constitute a breach of the implied covenant of good faith and fair dealing in the 1992 Agreement. Ross–Simons further alleges that Baccarat's refusal to deal represents tortious interference with Ross–Simons' contractual and business relationships with bridal registrants whose future business with Ross–Simons is jeopardized by Ross–Simons' inability to provide Baccarat products. Finally, Ross–Simons alleges that Baccarat has violated this Court's Preliminary Injunction by refusing to treat Ross–Simons on an equal basis with other authorized dealers.

Baccarat responds to all of the counts of the Amended Complaint by attacking the validity of the 1992 Agreement. According to Baccarat, its actions subsequent to signing the 1992 Agreement cannot be deemed

breaches of that compromise because the settlement itself is unenforceable. Baccarat presents two theories of unenforceability. First, Baccarat argues that because the 1992 Agreement is silent as to duration, under Rhode Island common law it is terminable at will by either party. Under this theory, Ross–Simons has no basis for claiming breach of a contract that has been terminated by Baccarat's actions. Second, Baccarat argues that the 1992 Agreement is void for lack of mutuality, claiming that the duty undertaken by Ross–Simons amounts to a mere illusory promise to order Baccarat products only when it chooses to do so.

The only legal arguments that Baccarat has presented in support of its motion for summary judgment are these two attacks on the validity of the 1992 Agreement. Therefore, determining the enforceability of that pact is central to the disposition of the summary judgment motion before the Court. If the 1992 Agreement is enforceable against defendant, summary judgment must be denied because material facts relating to whether the contract was breached or whether Baccarat's actions were legitimate business decisions remain. For the reasons outlined below, neither of defendant's arguments for invalidating Baccarat's duties under the contract passes muster under the summary judgment standard.

## C. Analysis

### 1. Jurisdiction

This Court has subject matter jurisdiction over this lawsuit based on diversity of citizenship of the parties. *See* 28 U.S.C. § 1332(a)(1). When the basis of a federal court's jurisdiction is diversity of citizenship, the court must apply the substantive law of the state where it sits, including that state's choice of law rules. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Spurlin v. Merchants Ins. Co.,* 57 F.3d 9, 10 (1st Cir.1995). The parties do not dispute that Rhode Island law governs plaintiffs' claims. Accordingly, the Court will dispense with a lengthy conflict of law analysis and will address the issues raised by this motion by applying Rhode Island law, and, when appropriate, "persuasive adjudications by courts of sister states, learned treatises,

and public policy considerations identified in state decisional law." *Blinzler v. Marriott Int'l, Inc.,* 81 F.3d 1148, 1151 (1st Cir.1996).

### 2. Construing Settlements as Contracts

■ At the center of this controversy is the 1992 Agreement between the parties. This written compromise was not, as defendant has argued, a contract for the sale of goods governed by the Uniform Commercial Code, but a settlement agreement to which the Code is inapplicable. *See* R.I. Gen. Laws § 6A-2-102 (1992) (applying UCC Article Two to sales transactions); *ITT Corp. v. LTX Corp.,* 926 F.2d 1258, 1266 (1st Cir.1991) (holding that UCC Article Two applies where the dominant purpose of a contract is a sales transaction).

The language of the writing itself compels this conclusion. This Court has explained that when a contract is clear and unambiguous on its face, the Court will enforce the contract as written. *See Kelly v. Tillotson–Pearson, Inc.,* 840 F.Supp. 935, 944 (D.R.I. 1994) (citing *Aetna Cas. & Sur. Co. v. Graziano,* 587 A.2d 916, 917 (R.I.1991)). The "Purpose" section of the 1992 Agreement explains that the writing "is made as a compromise between the parties for the settlement of their claims, differences and causes of action with respect to the dispute described below." The Agreement continues in the next paragraph by describing the antitrust action filed by Ross–Simons. The language of this contract in describing its purpose as the settlement of an antitrust lawsuit could not be more clear.

■ Rhode Island courts favor the settlement of disputes outside of the litigation process. *See Homar, Inc. v. North Farm Assocs.,* 445 A.2d 288, 290 (R.I.1982); *cf. Mathewson Corp. v. Allied Marine Indus., Inc.,* 827 F.2d 850, 852 (1st Cir.1987) ("As any litigator or judge can attest, the best case is a settled case."). Settlement agreements are treated as contracts and enforced under the rules governing contracts generally. *See Mathewson Corp.,* 827 F.2d at 852–53; *Interspace Inc. v. Morris,* 650 F.Supp. 107, 109 (S.D.N.Y.1986) (holding that under general contract principles, a settlement

agreement "is binding despite the fact that it was never submitted for court signature and filing"). Because defendant attacks the 1992 Agreement on the dual bases of indefiniteness and lack of mutuality, the task before the Court is to test the 1992 Agreement against the requisites of fundamental contract principles.

### 3. Indefiniteness of the 1992 Agreement

■ Under defendant's first theory of unenforceability, Baccarat argues that the settlement's lack of durational language renders the promises contained therein indefinite, resulting in an agreement that is terminable at will. While it is true that the 1992 Agreement does not state a specific date upon which Baccarat's obligations to perform will end, this omission is not fatal to the contract.

■ Definiteness is an important characteristic of a binding contract because a court can only enforce an agreement if it can specify the obligations undertaken by the parties. *See Soar v. National Football League Players' Ass'n*, 550 F.2d 1287, 1289–90 (1st Cir. 1977). A court asked to declare a contract binding must determine that the contract is definite enough that the court can be "reasonably certain" of the scope of each party's duties. *Downtown Inv. Ass'n v. Boston Metro. Bldgs., Inc.*, 81 F.2d 314, 319 (1st Cir. 1936).

In support of its theory, Baccarat cites a number of Rhode Island cases that construe employment contracts lacking durational terms as terminable at will by either party. *See, e.g., Salisbury v. Stone*, 518 A.2d 1355, 1360 (R.I.1986); *Bader v. Alpine Ski Shop, Inc.*, 505 A.2d 1162, 1166 (R.I.1986); *Powless v. Pawtucket Screw Co.*, 116 R.I. 158, 352 A.2d 643, 646 (1976). Defendant has also implied that the same rule would be applied to distributorship contracts by Rhode Island courts, but the Rhode Island Supreme Court did not adopt that rule in the one distributorship case cited by defendant. *See Wayne Distributing Co. v. Schweppes U.S.A. Ltd.*, 116 R.I. 108, 352 A.2d 625, 626–27 (1976) (expressly reserving determination of the rule to be applied in distributorship contracts of indefinite duration).

■ The cases cited by defendant are inapplicable to the present controversy, however. It is indeed a well-established principle in Rhode Island that contracts for personal services are terminable at will if the agreement is silent as to duration. *See Booth v. National India–Rubber Co.*, 19 R.I. 696, 36 A. 714, 715 (1897). However, the contract at issue here is not an employment agreement, nor is it a distributorship agreement; it is an agreement for the settlement of a lawsuit. Defendant has not identified, nor has the Court found, any cases in which the Rhode Island courts have extended this rule beyond employment contracts.[1] Furthermore, defendant has not proposed any persuasive rationale to support such an expansion of the rule by this Court.

■ This settlement agreement falls within the well-established category of contracts that terminate upon the happening of a specific event. A contract that "provide[s] for termination or cancellation upon the occurrence of a specified event" is not void as a perpetual contract or terminable at will. *Payroll Express Corp. v. Aetna Cas. & Sur. Co.*, 659 F.2d 285, 291 (2d Cir.1981) (applying New York law); *see Nicholas Labs. Ltd. v. Almay, Inc.*, 900 F.2d 19, 21 (2d Cir.1990) (applying New York law); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1012 (7th Cir.1985) (applying Illinois law); *Southern Hous. Partnerships, Inc. v. Stowers Management Co.*, 494 So.2d 44, 47–48 (Ala.1986); *G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co.*, 41 Mass. App.Ct. 274, 669 N.E.2d 787, 789–90 (1996). The specific event which allows termination can include a breach by a party of a term of the contract. *See First Commodity Traders*, 766 F.2d at 1012; *Payroll Express*, 659 F.2d at 292.

---

1. Even within the seemingly strict rule applicable to employment contracts, the Rhode Island courts have carved a significant exception: the presumption that an employment contract is at will if lacking a durational term may be rebutted by examining "prior dealings between the parties or ... surrounding facts or circumstances which might shed any light on the question." *School Comm. v. Board of Regents for Educ.*, 112 R.I. 288, 308 A.2d 788, 790 (1973).

The resolution of the *Payroll Express* case by the Second Circuit is instructive. In that case, Payroll Express, an insured, sued Aetna, an insurer, for breach of a crime insurance policy. *See Payroll Express,* 659 F.2d at 286. A lower court determined that the policy was possibly invalid because it lacked a termination provision and hence was potentially perpetual. *See id.* at 291. The policy did not state a specific duration and stated that it was terminable by Aetna only for nonpayment of the premiums. *See id.* at 289. On appeal, the Court of Appeals held that Aetna could not cancel the policy at will and rejected the notion that the lack of an express durational term rendered the contract defective. *See id.* at 292. Since the contract provided for an event which would allow termination, non-payment, it was not unilaterally terminable by either party until that event occurred, even though the performances contemplated by the contract may have lasted for an indefinite time. *See id.* at 291–92.

The contract before this Court also is not terminable at will because it is terminable upon the occurrence of certain events. In essence, the settlement agreement requires Baccarat to name Ross–Simons an authorized dealer and prohibits Baccarat from terminating Ross–Simons on specific grounds. The pact, however, does not prohibit Baccarat from terminating Ross–Simons for any reason other than their distaste for discount pricing and catalog sales.

Incorporated by reference into the 1992 Agreement was a listing of Baccarat's standard terms of doing business with retailers. The compromise referred to these terms with the phrase: "such prices and such terms as are available to other authorized dealers." These terms governed issues such as the payment of Baccarat invoices. Were Ross–Simons to materially breach these standard terms, Baccarat would be justified in terminating the agreement. The contract, therefore, implicitly provides for particular events which would allow Baccarat to terminate the contract.

For example, Baccarat's standard terms require payment to Baccarat within thirty days of invoice. If Ross–Simons were to refuse to pay Baccarat for a period long enough to constitute a material breach of their agreement, Baccarat would be free to cease doing business with Ross–Simons. Like the insurer in *Payroll Express,* Baccarat could terminate its duties under the 1992 Agreement for Ross–Simons' failure to pay for goods ordered. Thus, the 1992 Agreement could be terminated upon the happening of an event contemplated by the contract.

Furthermore, construction of this settlement agreement as terminable at will would contradict the fundamental purposes of such a compromise. As the Court of Appeals reasoned, it is likely that "Ross–Simons would not have abandoned [the antitrust suit] in exchange for a settlement that, in Judge Boyle's phrase, Baccarat could have ripped up the next morning." *Ross–Simons of Warwick,* 102 F.3d at 18. Contracts for personal services and contracts for the settlement of lawsuits have very different purposes. The central goal of a settlement agreement is to fashion a final and permanent resolution of a dispute. *See City of Homestead v. Beard,* 600 So.2d 450, 454 (Fla. 1992) ("The purpose behind settlement agreements is to end the dispute, not to delay the dispute until one of the parties decides it is advantageous to begin competing again."). Interpreting a contract with such a purpose as terminable at will is nonsensical and contrary to the plain intent of the parties reflected in the writing itself.

The writing contains provisions preventing termination of the compromise based on a change of facts and also binding the parties' successors to the obligations of the agreement. The Court of Appeals, based on a limited factual record, concluded that "the parties never intended the 1992 Agreement to be terminable at will." *See Ross–Simons of Warwick,* 102 F.3d at 18. Although Baccarat has had the opportunity to further develop the factual record in order to demonstrate a dispute of material fact regarding the parties' intentions, it has produced no new facts that would challenge this reading of the plain language of the 1992 Agreement.

Both the language used by the parties in the settlement agreement and the circumstances surrounding the creation of the 1992

Agreement support the conclusion that the compromise created more than an "at will" relationship. The implied termination condition renders the contract enforceable for as long as Ross–Simons complies with Baccarat's standard business terms. The contract is not so indefinite that it cannot be enforced by this Court.

### 4. Lack of Mutuality of Obligation in the 1992 Agreement

■ Defendant's second point of attack on the enforceability of the 1992 Agreement is lack of mutuality of obligation. Under defendant's reading of the compromise, Ross–Simons gave nothing but an illusory promise in exchange for Baccarat's promises to continue dealing with Ross–Simons. Defendant argues that while the 1992 Agreement requires Baccarat to deal with Ross–Simons without regard to Ross–Simons' discounting policies, the settlement does not require that Ross–Simons order any amount of products from Baccarat except any amount which Ross–Simons chooses to order. Furthermore, defendant deems Ross–Simons' dismissal of the antitrust suit inadequate consideration because the parties agreed that the dismissal would be without prejudice.

■ Defendant's argument is without basis. To satisfy the requirement of mutuality of obligation, both parties to a contract "must have been legally bound through the making of reciprocal promises." *Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 7–8 (1st Cir.1994) (applying Rhode Island law); *see B & D Appraisals v. Gaudette Mach. Movers, Inc.,* 733 F.Supp. 505, 507 (D.R.I.1990); *Centerville Builders, Inc. v. Wynne,* 683 A.2d 1340, 1341 (R.I.1996). Courts have identified certain types of promises that are deemed illusory and therefore incapable of satisfying the mutuality requirement. A promise is illusory if its performance depends on the occurrence of some act or event that is within the exclusive control of the very party that has made the promise. *See Centerville Builders, Inc.,* 683 A.2d at 1341; *Vickers Antone v. Vickers,* 610 A.2d 120, 123 (R.I.1992). Mutuality of obligation, however, was not lacking in the 1992 Agreement because Ross–Simons provided

legal consideration by promising to dismiss its antitrust lawsuit.

■ A fundamental requisite to a contract that can be enforced by a court is an exchange of legal consideration by the parties. *See Hayes v. Plantations Steel Co.,* 438 A.2d 1091, 1094 (R.I.1982); *see also National Educ. Ass'n–Rhode Island v. Retirement Bd. of the Rhode Island Employees' Retirement Sys.,* 890 F.Supp. 1143, 1159 (D.R.I.1995) (applying Rhode Island law). While consideration often takes the shape of a benefit conferred on another party to the agreement, a detriment suffered voluntarily is also recognized as valid consideration. *See Hayes,* 438 A.2d at 1094; *Dockery v. Greenfield,* 86 R.I. 464, 136 A.2d 682, 685 (1957) ("A valuable consideration may consist in some forbearance, detriment, loss, or responsibility given, suffered, or undertaken...."); *Darcey v. Darcey,* 29 R.I. 384, 71 A. 595, 597 (1909); 3 Samuel Williston, *A Treatise on the Law of Contracts* § 7:4, at 36–53 (Richard A. Lord ed., 4th ed.1992).

■ Among the detriments that qualify as legal consideration is the forbearance of a legal right. *See* Restatement (Second) of Contracts § 71 cmt. d (1981). The Rhode Island Supreme Court has held that forbearance of a claim is adequate consideration for a settlement agreement if the claim is "premised on an honest belief in its justness." *Lapan v. Lapan,* 100 R.I. 498, 217 A.2d 242, 244 (1966). Even if the claim were likely to be defeated in a judicial proceeding on the merits, the adequacy of the forbearance as consideration is not diminished. *See id.; Di Iorio v. Di Biazio,* 21 R.I. 208, 42 A. 1114, 1115 (1899). This Court has acknowledged that forbearance by not filing an antitrust lawsuit could qualify as legal consideration to support a settlement. *See Soar v. National Football League Players Ass'n,* 438 F.Supp. 337, 344 (D.R.I.1975). In *Soar,* this Court further noted that forbearance, like any species of consideration, must be bargained-for in exchange for a return promise. *See id.; see also Hayes,* 438 A.2d at 1094 ("Valid consideration.... must induce the return act or promise.").

There is ample evidence in the record to conclude that the parties bargained for the dismissal of the antitrust lawsuit. The terms of the settlement agreement were negotiated by representatives of both sides. The presidents of both companies executed the agreement. The settlement agreement itself speaks in the language of bargaining: the terms of performance in the compromise were labeled "mutual covenants" given "[i]n consideration" of each other. The settlement also explains its purpose as "compromising and settling the matters involved in this dispute" in the paragraph immediately following the one obligating Ross–Simons to dismiss the antitrust suit. Based on the language of the agreement and the statements of the parties in the record, there can be little doubt that Baccarat sought dismissal of the antitrust lawsuit in exchange for its several promises.

The promise to dismiss the lawsuit was fully performed by Ross–Simons. That the dismissal was without prejudice does not alter the nature of the act. Ross–Simons incurred a legal detriment by voluntarily dismissing its antitrust claims. As the Court of Appeals explained in its opinion affirming this Court's Preliminary Injunction against Baccarat: "Dismissing a lawsuit, even without prejudice, is not an idle matter; it has consequences in terms of costs, legal expenses, time bars, and the like." *Ross–Simons of Warwick*, 102 F.3d at 18. In pressing its antitrust claims in federal court, Ross–Simons incurred legal and other expenses. By dismissing the suit, Ross–Simons relinquished the legal investment it made in the antitrust claims. Once dismissed, renewal of the antitrust suit would have required the commitment of additional financial and human resources that would not have been expended but for the settlement. Because Baccarat bargained for this detriment to Ross–Simons, it is sufficient consideration to support a binding contract.

■ Baccarat has failed to demonstrate that it is entitled to summary judgment as a matter of law. The two arguments asserted as the bases for invalidating the 1992 Agreement are without merit. The compromise struck for the dismissal of Ross–Simons' an-

titrust suit is a valid binding contract. Remaining, however, are disputed material facts relating to whether Baccarat's actions constitute breaches of the 1992 Agreement, breach of the implied covenant of good faith and fair dealing inherent in the compromise, and intentional interference with Ross–Simons' business relationships. For these reasons, Baccarat's motion for summary judgment is denied.

## II. Motion to Strike

### A. Standard of Law for Motion to Strike

■ Under the Federal Rules of Civil Procedure, a court may strike from any pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). " 'Redundant' matter consists of allegations that constitute a needless repetition of other averments." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1382, at 704 (2d ed.1990). In resolving motions to strike, trial courts are empowered with broad discretion. *See Alvarado–Morales v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir.1988); *see also Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 665 (7th Cir.1992); *Mastrocchio v. Unnamed Supervisor, Special Invest. Unit*, 152 F.R.D. 439, 440–41 (D.R.I.1993).

■ Motions to strike, however, are disfavored by the courts. *See Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23 (1st Cir.1985); *Amoco Oil Co. v. Local 99 Int'l Bhd. of Elec. Workers*, 536 F.Supp. 1203, 1225 (D.R.I.1982). Mere redundancy is insufficient to support a motion to strike; the movant must demonstrate that prejudice would result if the offending material remained in the pleadings. *See Amoco Oil Co.*, 536 F.Supp. at 1225; *Russo v. Merck & Co.*, 138 F.Supp. 147, 148–49 (D.R.I.1956); *see also Toucheque v. Price Bros. Co.*, 5 F.Supp.2d 341, 350 (D.Md.1998); 5A Wright & Miller, *supra*, § 1382, at 705–06. A court should be reluctant to grant this severe remedy if "the court is in doubt as to whether the challenged matter may raise an issue of fact or law." *Sagan v. Apple Computer, Inc.*, 874 F.Supp. 1072, 1079 (C.D.Cal. 1994).

## B. Analysis

Neither of defendant's targets in the Amended Complaint are so offensive to warrant application of Rule 12(f). The touchstone that should guide courts in analyzing motions to strike for redundancy is prejudice to the moving party. Defendant has not demonstrated any prejudice in this case.

■ Regarding Count VI of plaintiffs' Amended Complaint, defendant has failed to even allege prejudice to its position in this litigation in allowing that count to remain. Mere redundancy of other averments is insufficient to invoke a court's power to strike material from a pleading. Some showing of prejudice is required and defendant has entirely failed to make that showing.

■ A motion to strike is also an inappropriate tool with which to dispose of plaintiffs' requests for punitive damages. Whether punitive damages may be awarded in a breach of contract action is a question of law. This issue is more appropriately resolved by the motion to dismiss for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6).

## III. Motion to Dismiss

### A. Standard of Law for Motion to Dismiss

In ruling on a motion to dismiss, the Court construes the complaint in the light most favorable to plaintiff, taking all well-pleaded allegations as true and giving plaintiff the benefit of all reasonable inferences. *See Figueroa v. Rivera*, 147 F.3d 77, 80 (1st Cir. 1998). Dismissal under Rule 12(b)(6) is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); 5A Wright & Miller, *supra*, § 1357.

### B. Analysis

#### 1. Count VI of the Amended Complaint

Count VI of the Amended Complaint seeks nominal and punitive damages for alleged violations by defendant of this Court's Preliminary Injunction order. Through artful phrasing, Ross–Simons attempts to conjure this additional count from Baccarat's actions following the issuance of the Preliminary Injunction, entitling the proffered claim "Continuing Breaches and Tortious Conduct." However, plaintiffs have chosen the wrong tool to enforce their rights under the Preliminary Injunction.

■ A federal court may enforce its orders through contempt proceedings. *See* 18 U.S.C. § 401 (granting courts the power to punish by fine or imprisonment "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command"); *Gunn v. University Comm. to End War in Viet Nam*, 399 U.S. 383, 389, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970). Where a party to a civil action seeks to enforce a remedy granted by a court, that party should motion the court to hold the offending party in contempt of the court's order. *See* 11A Wright & Miller, *supra*, § 2960, at 374–75.

■ The facts alleged by Ross–Simons in Count VI may constitute contempt, but they do not rise to the level of a separate cause of action which could support an award of damages. The appropriate remedy for violations of this Court's Preliminary Injunction order is a motion to hold defendant in contempt. Count VI, therefore, is dismissed for failure to state a cause of action upon which relief can be granted.

#### 2. Request for Punitive Damages

The remaining counts of the Amended Complaint, except the request for injunctive relief, seek an award of punitive damages. Two issues are raised by this request. First, this Court must determine whether punitive damages may be awarded at all when a plaintiff seeks only nominal and punitive damages, but no compensatory damages. Second, this Court must determine whether under Rhode Island law plaintiff may recover punitive damages for a cause of action alleging a breach of contract. This Court has examined the state of punitive damages law in Rhode Island extensively in the recent past. *See North Atlantic Fishing, Inc. v.*

*Geremia,* 153 B.R. 607, 613–15 (D.R.I.1993); *Regan v. Cherry Corp.,* 706 F.Supp. 145, 152–53 (D.R.I.1989). This Court, therefore, will dispense with a lengthy restatement of basic doctrine and encapsulate the fundamentals briefly.

■ Courts interpreting Rhode Island law have recognized that punitive damages serve two purposes: to punish the wrongdoer and to deter others from committing similar extreme acts. *See, e.g., North Atlantic Fishing, Inc.,* 153 B.R. at 613; *Palmisano v. Toth,* 624 A.2d 314, 317–18 (R.I.1993); 1 Dan B. Dobbs, *Law of Remedies* § 3.11(3), at 475 (2d ed.1993). Compensation of the victim is not generally considered to be one of the goals of this extreme remedy. *See Greater Providence Deposit Corp. v. Jenison,* 485 A.2d 1242, 1244 (R.I.1984).

■ Under Rhode Island law, a plaintiff seeking punitive damages must show that "the defendant acted with malice or in bad faith." *Palmisano,* 624 A.2d at 318. The Rhode Island Supreme Court has discussed with approval this Court's formulation of the test: the plaintiff must allege that the defendant intended to cause harm. *See id.* (citing *Wilson Auto Enters., Inc. v. Mobil Oil Corp.,* 778 F.Supp. 101, 107 (D.R.I.1991)); *see also Regan,* 706 F.Supp. at 153 ("[A] court may only award punitive damages for intentional conduct that is malicious." (emphasis omitted)). Before the trier of fact will be allowed to calculate the size of a punitive damages award, the trial court must first determine whether the plaintiff has alleged sufficient facts to support an award of punitive damages. *See Palmisano,* 624 A.2d at 318; *Peckham v. Hirschfeld,* 570 A.2d 663, 668 (R.I.1990); *Sherman v. McDermott,* 114 R.I. 107, 329 A.2d 195, 196 (1974).

■ Rhode Island courts have not spoken directly on the availability of punitive damages when the plaintiff seeks nominal rather than compensatory damages. Given this state of the law in the forum, this Court will seek guidance from "persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." *Blinzler v. Marriott Int'l, Inc.,* 81 F.3d 1148, 1151 (1st Cir.1996). Based on the analysis to follow, this Court determines that a request for nominal damages is sufficient to support an award of punitive damages.

Most courts agree that punitive damages are recoverable only where the plaintiff has suffered actual injury. *See* 1 Linda L. Schlueter & Kenneth R. Redden, *Punitive Damages* § 6.1(D)(3), at 340–41 (3d ed.1995) (listing and discussing cases). Confusion over this rule has developed, however, because of the several terms used by the courts in formulating this proposition. While some jurisdictions require "damages," indicating a need for a monetary award, other courts use the word "damage" to mean some type of harm, but not necessarily a pecuniary one, while still others require only a legal "injury," or the invasion of a legal right. *See* 1 *id.* § 6.1(D)(2), at 339–40. Ross–Simons has alleged that while it has suffered damages to its reputation among members of the luxury retail community, bridal registry participants, and their base of consumers, these damages are unquantifiable. The specific question that this Court must address then is whether punitive damages may be awarded when the harm alleged is a legal injury but the plaintiff seeks only nominal damages because its true damages are unquantifiable.

A large number of courts that have addressed this issue have ruled that punitive damages may be supported by an award of nominal damages. *See Green Tree Acceptance, Inc. v. Standridge,* 565 So.2d 38, 43 (Ala.1990); *Oaksmith v. Brusich,* 774 P.2d 191, 201 (Alaska 1989); *McLaughlin v. National Union Fire Ins. Co.,* 23 Cal.App.4th 1132, 29 Cal.Rptr.2d 559, 578 (1994); *Young v. Scott,* 108 Idaho 506, 700 P.2d 128, 134 (App.1985); *Arlington State Bank v. Colvin,* 545 N.E.2d 572, 580 (Ind.Ct.App.1989); *Lawrence v. Risen,* 598 S.W.2d 474, 476 (Ky.Ct. App.1980); *Shell Oil Co. v. Parker,* 265 Md. 631, 291 A.2d 64, 71 (1972); *Harris v. American Gen. Life Ins. Co.,* 202 Mont. 393, 658 P.2d 1089, 1092 (1983); *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224, 1229–30 (1984); *Bryce v. Wilde,* 39 A.D.2d 291, 333 N.Y.S.2d 614, 616, *aff'd,* 31 N.Y.2d 882, 340 N.Y.S.2d 185, 292 N.E.2d 320 (1972); *Jones v. Gwynne,* 312 N.C. 393,

323 S.E.2d 9, 16 (1984); *Beavers v. Lamplighters Realty, Inc.*, 556 P.2d 1328, 1333 (Okla.App.1976); *Rhoads v. Heberling*, 306 Pa.Super. 35, 451 A.2d 1378, 1383 (1982); *Sandel v. Cousins*, 266 S.C. 19, 221 S.E.2d 111, 112 (1975); *see also Insurance Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 847, 853 (4th Cir.1992) (applying South Carolina law); *Keehr v. Consolidated Freightways of Delaware, Inc.*, 825 F.2d 133, 141 (7th Cir.1987) (applying Indiana law); *Spaeth v. Union Oil Co.*, 762 F.2d 865, 866 (10th Cir.1985) (applying Oklahoma law). A number of other courts have held that nominal damages alone are insufficient to support an award of punitive damages. *See, e.g., Magma Copper Co. v. Shuster*, 118 Ariz. 151, 575 P.2d 350, 352–53 (App.1977); *Stoner v. Houston*, 265 Ark. 928, 582 S.W.2d 28, 31 (1979); *Stiefel v. Schick*, 260 Ga. 638, 398 S.E.2d 194, 196 (1990); Richard C. Tinney, Annotation, *Sufficiency of Showing of Actual Damages to Support Award of Punitive Damages–Modern Cases*, 40 A.L.R.4th 11, 39 (1985) (collecting cases).

■ An examination of the rationales behind these opposing rules demonstrates the superiority of the former formulation. Because the purposes of punitive awards are to punish and deter, the most important factor to consider when contemplating their appropriateness is the severity of the wrongdoer's actions. *See Keehr*, 825 F.2d at 141. A respected commentator, in criticizing the rule requiring a showing of compensatory damages before punitive damages are allowed, has noted that "[t]he absence of recoverable compensatory damages—actual, presumed or otherwise—does not seem to have much bearing on the propriety of a punitive award." 1 Dobbs, *supra*, § 3.11(10), at 515. What matters most is whether the defendant's actions merit punishment, not whether the plaintiff is able to calculate large material damages. *See Keehr*, 825 F.2d at 141 ("[T]he appropriateness of a punitive damage award is determined by the degree of the defendant's misconduct rather than by the amount of compensatory damages awarded.").

■ Such a formulation of the rule, however, does not relieve a plaintiff from proving a valid claim. The actual damage required for the award of punitive damages can be demonstrated by establishing a legal injury that results in a valid cause of action. *See* 1 Dobbs, *supra*, § 3.11(10), at 515. Where a plaintiff alleges, as Ross–Simons does here, that the injury caused by the defendant is incapable of calculation, but significant nonetheless, the need for punitive damages is all the more evident. *See* 1 *id.* § 3.11(10), at 516 ("[I]f the defendant's conduct otherwise warrants punitive liability, the need for punishment or deterrence may be increased by reason of the very fact that the defendant will have no liability for compensatory damages.").

Application of the rule advocated by defendant is undermined by an examination of the typical rationale cited in its defense. In several states that reject the adequacy of nominal damages as a basis for an award of punitive damages, the courts have offered as a rationale the "ratio rule" followed in those states. *See Keehr*, 825 F.2d at 140. Under the "ratio rule," punitive damages must be in some reasonable proportion to compensatory damages. Beginning with that maxim, "it is but a short and logical step to [require] . . . compensatory damages as a prerequisite for any award of punitive damages." *Newton v. Yates*, 170 Ind.App. 486, 353 N.E.2d 485, 491 (1976).

■ This rationale, however, is inapplicable to the law of punitive damages in Rhode Island. As this Court has explained: "Rhode Island law does not require that punitive damages be directly proportional to compensatory damages." *North Atlantic Fishing, Inc.*, 153 B.R. at 614; *cf.* 1 Dobbs, *supra*, § 3.11(11), at 519 (criticizing the "ratio rule" as "in direct conflict with the punitive purpose of the award" of punitive damages and "equally in conflict with the deterrent purposes of the award"). Appropriate factors for consideration in determining the amount of punitive damages include the financial condition of the defendant and the need for deterrence and punishment. *See Palmisano*, 624 A.2d at 318–19. Although punitive damages must not be excessive, under Rhode Island law the trier of fact is not restrained by a

ratio of compensatory damages in calculating exemplary damages.

The significance of the "ratio rule" as a rationale for the requirement of compensatory damages was illustrated by the United States Court of Appeals for the Seventh Circuit in *Keehr*. Applying Indiana law, the Court of Appeals held that when the Supreme Court of Indiana abandoned the "ratio rule" it also eliminated the rationale for requiring compensatory damages for a punitive damages award. *See Keehr*, 825 F.2d at 140–41. The Court then decided that holding nominal damages sufficient to support an award of punitive damages was consistent with the deterrent and punishment goals of exemplary damages. *See id.* at 141.

In Rhode Island, the "ratio rule" holds no sway. There is no reason under the principles of punitive damages law, therefore, to require a plaintiff to show more than a valid legal injury, supported by an award of at least nominal damages, in order to recover an award of punitive damages. This conclusion puts to rest defendant's challenge of the request for punitive damages on the claim for tortious interference with business relationships.

 A second question awaits with regard to the contract and breach of the covenant of good faith claims. Defendant challenges the availability of punitive damages for breach of contract claims. Plaintiffs' claim for breach of the covenant of good faith and fair dealing is also implicated by this attack since the Rhode Island Supreme Court has stated that the breach of this covenant implied in every contract gives rise only to a contract claim and not an independent tort cause of action. *See A.A.A. Pool Serv. & Supply, Inc. v. Aetna Cas. & Sur. Co.*, 121 R.I. 96, 395 A.2d 724, 726 (1978); *see also Fleet Nat'l Bank v. Liuzzo*, 766 F.Supp. 61, 67 (D.R.I.1991). Therefore, the determination of the availability of punitive damages for the two breach of contract counts will settle the question for the breach of covenant claim as well.

 This Court's inquiry into this question is two-fold. First, may punitive damages ever be awarded for breaches of con-

tract under Rhode Island law? Second, if such a remedy is available, what must a plaintiff demonstrate to meet a threshold inquiry into the availability of this remedy in a particular case? This Court concludes that punitive damages are not available in actions to recover damages for breach of contract except where the breach also constitutes an independent tort.

The traditional common law rule prohibited punitive damage awards in a simple breach of contract action. *See* 5 Arthur Linton Corbin, *Corbin on Contracts* § 1077, at 437–39 (1964); 3 Dobbs, *supra*, § 12.5(2), at 117; 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 12.8, at 189–90 (1990); 1 Schlueter & Redden, *supra*, § 7.0, at 369. Justice Holmes explained the underlying basis for this prohibition: "If a contract is broken the measure of damages generally is the same, whatever the cause of the breach." *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S.Ct. 754, 47 L.Ed. 1171 (1903). Compensation of the injured party for lost expectations, not punishment of the breaching party, is the well-known measure of contract damages. *See* 5 Corbin, *supra*, § 992, at 5–7 (stating that the goal of contract damages is to "put the injured party in as good a position as he would have had if performance had been rendered as promised"). The Rhode Island courts have addressed the specific issue of punitive damages in contract cases only briefly. In the one instance in which the Rhode Island Supreme Court has directly broached this subject, it indicated that punitive damages might be available only for a narrow class of actions.

In *O'Coin v. Woonsocket Inst. Trust Co.*, 535 A.2d 1263 (R.I.1988), the plaintiff sued his bank for disclosure to a third party of information regarding his business relationship with the bank. *See id.* at 1264. The plaintiff alleged that such disclosure constituted a breach of contract by the bank. *See id.* The plaintiff sought nominal and punitive damages. *See id.* at 1266. The Supreme Court of Rhode Island declined to determine whether the plaintiff's cause of action was properly labeled a tort or a breach of contract, but made the following

remark regarding the request for punitive damages:

> [W]e note that plaintiff asserts that his action sounds in contract and observe that nominal and punitive damages do not lie in such actions, absent the most egregious circumstances, which we hold as a matter of law are not here present.

*Id.* at 1266–67.

The clear implication of the use of the phrase "egregious circumstances" by the *O'Coin* Court is that punitive damages are available only for breaches of contract that also constitute independent torts. This result is consistent with the law of other jurisdictions. Many courts that follow the traditional common law rule recognize an exception for independent torts arising out of a breach of contract. *See, e.g., Ferguson Transp., Inc. v. North American Van Lines, Inc.,* 687 So.2d 821, 822–23 (Fla. 1996); *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 767 (1995); *Twin City Fire Ins. Co. v. Davis,* 904 S.W.2d 663, 665 (Tex.1995); 1 Schlueter & Redden, *supra,* § 7.3(A), at 377 (listing cases). The Restatement (Second) of Contracts has also adopted this exception. *See* Restatement (Second) of Contracts § 355 (1981). "Egregious" conduct triggering punitive damage awards in contract cases has been equated with tort liability by other jurisdictions. *See New York Univ.,* 639 N.Y.S.2d 283, 662 N.E.2d at 767; *Stern Enterprises v. Plaza Theaters I and II, Inc.,* 105 Ohio App.3d 601, 664 N.E.2d 981, 984 (1995). Punitive damages have been awarded when the breach of contract also constituted the independent torts of fraud, conversion, intentional interference with business relationships, and breach of fiduciary duty. *See* 1 Schlueter & Redden, *supra,* § 7.3(A), at 380 (listing cases).

■ Ross–Simons has alleged the tort of intentional interference with business relationships. Applying the independent tort exception, this Court holds that on this tort claim, punitive damages are available even though the acts claimed to constitute the tort are also alleged to constitute breach of contract. Under the traditional common law rule, which this Court adopts, punitive damages are not available for defendant's alleged breach of contract or for defendant's alleged breach of the covenant of good faith and fair dealing because those violations do not give rise to independent torts.

### CONCLUSION

For the forgoing reasons, defendant's motion for summary judgment is denied, as is defendant's motion to strike. Defendant's motion to dismiss Count VI is granted. Defendant's motion to dismiss the punitive damages claims contained in Counts I, II, and III is granted. Defendant's motion to dismiss the punitive damages claim contained in Count IV is denied.

It is so ordered.