FOOD & WATER WATCH,
INC., Plaintiff

v.

U.S. ARMY CORPS OF ENGINEERS,
et. al., Defendants,

v.

Massachusetts Biological Laboratory,
Defendant–Intervenor.

Civil Action No. 08–11149–PBS.

United States District Court,
D. Massachusetts.

Aug. 6, 2008.

Erica A. Fuller, Ian Crawford, Todd & Weld LLP, Boston, MA, Marianne Cufone, Food & Water Watch, Inc., Washington, DC, Zachary B. Corrigan, F. Anthony Mooney and Associates, Wellesley, MA, for Plaintiff.

Rachael S. Rollins, United States Attorney's Office, Boston, MA, for Defendants.

Anton P. Giedt, United States Attorney's Office, Boston, MA, for Defendants/Defendant–Intervenor.

Mark C. Kalpin, Lauren G. Brunswick, Wilmerhale LLP, Boston, MA, for Defendant–Intervenor.

### MEMORANDUM AND ORDER

SARIS, District Judge.

## I. INTRODUCTION

Plaintiff Food and Water Watch, Inc. ("FWW"), a non-profit public interest consumer organization,[1] has moved for a preliminary injunction ordering the United States Army Corps of Engineers ("the Corps" or "USACOE") to revoke a permit that it issued to the Massachusetts Biological Laboratory ("MBL"), which has intervened in the action. The permit authorizes MBL, as part of a federally-funded aquaculture research project, to install a fish containment structure, known as an Aquadome ™, on the seafloor of Buzzards Bay near the Weepeket Islands, Massachusetts. Half of a geodesic sphere, the Aquadome is 32 feet in diameter and 16 feet tall and will be submerged in Buzzards Bay near Woods Hole for up to six months. The container holds approximately 5,000 black sea bass. To the Court's knowledge, the initial phase of the project's field component is currently underway: the fish are in the cage.

Plaintiff contends that the Corps' issuance of the permit to MBL was in violation of several federal laws and regulations, including the National Environmental Policy Act ("NEPA").[2] *See* 42 U.S.C. §§ 4331–4335. Plaintiff has expressed several concerns, namely that the experiment may adversely affect the ocean floor at the experiment site and the juvenile fish who live there and may cause genetic and other harm to the wild fish population in Buzzards Bay. Plaintiff has not submitted any expert affidavits.

After a non-evidentiary hearing, I **DENY** Plaintiff's motion for a preliminary injunction on the ground that it has not shown a likelihood of success on its NEPA claims, or irreparable harm (to the environment) because of the short duration and small size of the project. Moreover, in balancing the harm to the parties, I find that issuing an injunction would burden the MBL and harm the public interest.

## II. FACTUAL BACKGROUND

### A. The Experiment[3]

The experiment at issue in this case is being conducted by MBL, a research and education organization located in Woods Hole, Massachusetts. MBL is a one-hundred-and-twenty-year-old nonprofit research educational organization, and is the oldest marine laboratory in the western hemisphere. The Project is funded through a grant from the National Oceanic and Atmospheric Administration's National Marine Aquaculture Initiative. MBL's permit application states that the specific goal of the project is "to demonstrate that methods of holding and conditioning hatchery fish to respond to an acoustic signal at feeding time, and weaning fish to natural forage can ease their transition to the wild,

---

1. The government does not contest standing. See Decl. Carolyn Tetri, a member of FWW who enjoys recreation on Buzzards Bay.

2. While there are other causes of action, Plaintiff focuses only on NEPA in its request for preliminary relief.

3. The factual background is derived from the Administrative Record and the affidavits and declarations submitted by the parties. Background information from the briefs is also included to the extent that it seems to be undisputed.

and improve stock enhancement efforts." (AR 148.) MBL has also referenced "explor [ing] the feasibility of ranching via acoustic conditioning" as part of the "basic project purpose." (AR 173.)

The Aquadome is half of a geodesic sphere, 32 feet in diameter and 16 feet tall and is anchored to the seafloor by five 1,200 pound deadweight anchors, placed in a circle approximately 70 feet in diameter around the Aquadome. (AR 24.) Covered with PVC coated galvanized steel wire mesh and resting on the seafloor, the Aquadome acts as a cage, containing fish within the half-sphere structure. (AR 24.) The Aquadome, five anchors, and the lighted marker buoy attached to its top are all temporary installations, to be removed at the conclusion of the research project in October 2008. (AR 24.)

Buzzards Bay, the site of the experiment, is an estuary located between the western most part of Cape Cod, Massachusetts and the Elizabeth Islands. The bay is 28 miles long and averages about 8 miles in width. (AR 24.) The MBL experiment will directly impact about 50 square feet of the approximately 228 square miles of Buzzards Bay seafloor. (AR 24–25.)

Over the past several months, MBL has raised hatchery-reared black sea bass in a laboratory setting, (AR 155), and engaged in a series of trials to determine how long it takes to train the fish to react to sound for a reward. (Lindell Aff. ¶¶ 11–12.) The next phase of the Project involves placing up to 5,000 of these black sea bass (that have been tagged) into the Aquadome in the waters near the northernmost Weepeket Island, approximately three nautical miles from Woods Hole, Massachusetts. (AR 147–48, 155.) The fish will remain contained in the Aquadome for three to

four weeks. During this three-to-four week period, an acoustic signal will be sounded prior to each daily feeding. (USACOE Opp'n 5.) At the close of this "acclimation" period, adjustments to the cage will be made so that fish can swim in and out of the Aquadome. (AR 33, 165; USACOE Opp'n 5.)

Once the fish are "free-ranging," there will be three feedings per week, accompanied by the same acoustic signal that was sounded prior to the daily feedings while the fish were contained in the Aquadome. (USACOE Opp'n 5; MBL Opp'n 5; AR 26.) MBL researchers will monitor the structure to determine whether fish respond to the acoustic signal and return to the structure and will use tags returned from local fisherman to gather additional biological information about the released fish. (USACOE Opp'n 5; MBL Opp'n 5; AR 26–27.)

## B. The Permitting Process

Because the project involves the installation of a structure in the navigable waters of the United States, MBL needed to secure a permit from the Corps, pursuant to Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. MBL submitted a permit application to the Corps on February 5, 2008. (AR 147–48, 155.)

On February 26, 2008, the Corps issued a public notice about the Project and solicited comments "on both the project itself and the range of issues to be addressed in the environmental documentation." (AR 42.) The public comment period ended on March 26, 2008. (AR 42.) The Corps received eleven comment letters during the period, including a submission by Plaintiff FWW, filed on March 26, 2008.[4] (AR 39, 88–95.)

---

4. In its brief, the Corps states that it received eleven comment letters during the comment period and then hundreds of form letter

On May 15, 2008, the Corps provided Plaintiff and others who submitted comments with a document summarizing all of the public comments submitted to the Corps and MBL's responses to these comments. (AR 62.) MBL's Responses were dated April 28, 2008. (AR 133–140.) On May 28, 2008, Plaintiff sent a second letter to the Corps to "respond to MBL and also explain [its] significant concerns with the permitting process relative to MBL's project." (AR 102–109.)

On May 30, 2008, the Corps issued its Environmental Assessment and Statement of Findings on the Project ("EA"). (AR 24–36.) At the close of the EA, although acknowledging "a minor negative impact on water quality in the vicinity of the project," the Corps reached a finding of no significant impact ("FONSI"). (AR 26, 35–36.) The Corps then issued MBL a permit to conduct the Project. (AR 3–14.)

**C. Procedural History**

On July 3, 2008, Plaintiff filed a complaint ("Complaint") in this Court naming the Corps and various government officials as defendants. The Complaint seeks temporary, preliminary, and permanent injunctive relief, and includes a request for an order directing Defendants to revoke, rescind, or suspend the RHA Section 10 permit that it has issued to MBL. (Compl.¶ 8.) The named defendants opposed the preliminary injunction motion on July 11, 2008. (Docket No. 99.) On the same day, MBL moved to intervene (Docket No. 100); two days later, MBL submit-

ted its own opposition to Plaintiff's motion for preliminary injunction (Docket No. 137.) This Court has allowed MBL's motion to intervene. A hearing was held on July 14, 2008.[5]

At the hearing, MBL stated that it planned to place the fish in the Aquadome (which has already installed in the water) by the close of the week.

**III. DISCUSSION**

**A. Standard of Review**

 It is well-settled that, when considering a motion for a preliminary injunction, a district court must weigh four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs (i.e., a balancing of the equities); and (4) the effect, if any, on the public interest. *United States v. Weikert*, 504 F.3d 1, 5 (1st Cir. 2007); *see Nw. Bypass Group v. U.S. Army Corps of Eng'rs*, 470 F.Supp.2d 30, 36, 59–67 (D.N.H.2007) (using the traditional four-part test when evaluating Plaintiff's request for preliminary injunction on NEPA claim). A preliminary injunction is a "potent weapon." *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 163 (1st Cir.2004). Therefore, the party seeking the injunction bears the burden of demonstrating each factor. *See Granny Goose Foods, Inc. v. Bhd. of*

emails beginning in late May 2008. (USA-COE Opp'n 6; AR 130.)

5. Subsequent to the hearing, Plaintiff has made several filings: a First Amended Complaint (Docket No. 141), a motion to strike portions of MBL's Opposition to Plaintiff's Motion for Preliminary Injunction and its accompanying affidavit of Scott R. Lindell (Docket No. 143), and a Motion for Leave to

Join Additional Parties and Amend the First Amended Complaint (Docket No. 153). For purposes of this motion for preliminary injunction, this Court relies on the original complaint filed on July 3, 2008, not the First Amended Complaint.

As to the motion to strike, the Court *DENIES* the motion.

*Teamsters and Auto Truck Drivers Local No. 70*, 415 U.S. 423, 441, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).

■ The first two factors—likelihood of success on the merits and irreparable harm—are threshold issues; a plaintiff who is unable to demonstrate either must fail in his quest for preliminary injunctive relief. *See Weikert*, 504 F.3d at 5 ("[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.") (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir.2002)); *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir.2000) ("Irreparable harm is an essential prerequisite for a grant of injunctive relief.").

**B. NEPA**

■ The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331–4335, "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). "NEPA is not designed to prevent all possible harm to the environment," but rather "to influence the decisionmaking process ... [by] mak[ing] government officials notice environmental considerations and take them into account." *Commonwealth of Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir.1983). "[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350, 109 S.Ct. 1835.

Under NEPA, a federal agency must prepare an environmental impact statement ("EIS") for any "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c); *see* 40 C.F.R. § 1508.11. To de-termine whether an EIS is needed for a particular project, the Council on Environmental Quality ("CEQ") regulations instruct an agency to prepare an Environmental Assessment ("EA"). *See* 40 C.F.R. § 1501.4. The EA is defined as a "concise public document" which includes "brief discussions of the need for the proposal, of alternatives, ... of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9. If, after completing the EA, the agency determines that a full EIS is not necessary, the agency then prepares a finding of no significant impact ("FONSI"). A FONSI is a "document ... briefly presenting the reasons why [the proposed action] ... will not have a significant effect on the human environment." 40 C.F.R. § 1508.13; *see* 33 C.F.R. Part 325, Appx. B, § 7a (stating that the FONSI is placed at the end of the EA and that the "combined document normally should not exceed 15 pages"). USACOE's regulations implementing NEPA emphasize that an EIS is not always required; in fact, the regulations state that "[m]ost permits will normally require only an EA." 33 C.F.R. § 230.7(a); *Friends of Magurrewock, Inc. v. U.S. Army Corps of Eng'rs*, 498 F.Supp.2d 365, 373 (D.Me. 2007).

Here, Plaintiff's core allegation is that the Corps issued a permit to MBL without conducting an EIS in violation of NEPA. (Compl.¶ 79–108.) Specifically, Plaintiff alleges that:

(1) the EA and FONSI are inadequate because the Corps failed to fully and properly consider several possible environmental impacts which, in Plaintiff's view, rendered the project one which "significantly affects the quality of the human environment," 42 U.S.C. § 4332(c); (Compl.¶¶ 84–94);

(2) the EA failed to include a required discussion of reasonable alternatives (Compl.¶¶ 95–99);

(3) the permit failed to incorporate mitigation measures and conditions as required by NEPA (Compl.¶¶ 100–104); and

(4) the Corps failed to satisfy a regulation requiring, in certain circumstances, that a draft FONSI be circulated for public comment (Compl.¶¶ 105–108).

## C. Likelihood of Success on the Merits

■ When, as here, a court reviews a federal agency action under NEPA, the standard of review is supplied by the Administrative Procedures Act ("APA"). *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir.1996). Under the APA, a district court will uphold an agency's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The First Circuit has explained that a court reviewing an agency action under the APA's "arbitrary and capricious" standard must "determine whether the [agency] has *considered the relevant factors* and *articulated a rational connection* between the facts found and the choice made." *Dubois*, 102 F.3d at 1284–85 (explaining that the relevant inquiry is, in essence, whether the decision "makes sense") (internal quotation marks omitted). While the reviewing court affords significant deference to the agency, the review "is not a rubber stamp." *Id.* at 1285. A court, for example, "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■ Plaintiff contends that the review at hand falls into a narrow category of cases where a court gives heightened scrutiny to an agency action. This heightened review is triggered when "the presumption of agency regularity ... is rebutted, as where the agency has demonstrated undue bias towards particular private interests." *Natural Res. Def. Council, Inc. v. Sec. Exch. Comm'n.*, 606 F.2d 1031, 1049 n. 23 (D.C.Cir.1979). Plaintiff, however, does not provide any evidence of "undue bias" or other misconduct to warrant a departure from the ordinary "arbitrary and capricious" standard.

Thus, to succeed on the merits of these claims, Plaintiff must show that the Corps' decision to issue a FONSI was arbitrary and capricious. I will take each of Plaintiff's NEPA allegations in turn.

### 1. Adequacy of the EA and FONSI

Plaintiff claims that the EA was deficient because it failed to adequately consider several significant environmental concerns, and that the Corps' comments merely parroted MBL's responses to public comments.

■ Review of an agency's EA and FONSI is conducted under a four-part analysis:

First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Coalition of Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66–67 (D.C.Cir.1987); *see Nw.*

*Bypass Group,* 470 F.Supp.2d at 61 (applying the Dole factors when reviewing a FONSI); *City of Waltham v. U.S. Postal Serv.,* 786 F.Supp. 105, 121 (D.Mass.1992) (same), *aff'd,* 11 F.3d 235 (1st Cir.1993). If the agency's EA and FONSI satisfy the four-factor *Dole* test, the FONSI is considered substantively adequate. *Advocates for Transp. Alternatives, Inc. v. U.S. Army Corps of Eng'rs,* 453 F.Supp.2d 289, 300 (D.Mass.2006).

a. *The EA*

■ Plaintiff contends that the EA is deficient with respect to four potential environmental impacts, each of which was raised by Plaintiff in its March comments on the Project. Plaintiff expressed concern that the experiment may: (1) affect Essential Fish Habitats ("EFH") [6] for several fish species; (2) create "anoxic conditions, with oxygen depleted from the sediment" in the sea floor, and, as a result, "negatively affect juvenile fish living on the ocean floor" at the experiment site; (3) harm the genetic health of wild fish populations; and (4) harm wild fish populations that may become dependent on human feeding. (AR 88–95.)

While Plaintiff concedes that the Corps identified each of its four environmental concerns,[7] Plaintiff contends that the Corps failed to take the required "hard look" at the problems. The Corps did address each of the four primary concerns raised by Plaintiff in its March comments.

(AR 27–36.) As Plaintiff points out, however, the USACOE responses in the EA "repeated verbatim, or nearly verbatim," the responses to comments authored by MBL. (Compl.¶ 64.)

The fact that the Corps sought and relied upon MBL's comments is not, in itself, troubling. The Corps' regulations explicitly allow agency officials to provide copies of the public comments to the applicant so that the applicant can "furnish his views" on the issues raised by the comments. 33 C.F.R. § 325.2(a)(3). Extensive involvement by the applicant in the review process is permitted. CEQ regulations provide that an applicant may prepare the EA provided that the agency "make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment." 40 C.F.R. § 1506.5(b). *See Carcieri v. Kempthorne,* 497 F.3d 15, 46 (1st Cir.2007) (holding that an agency's FONSI passed muster under NEPA even though the EA had been prepared by the applicant), *cert. granted on other grounds,* —— U.S. ——, 128 S.Ct. 1443, 170 L.Ed.2d 274 (2008).

Here, there is no dispute that portions of the Corps' responses to public concerns contained in the EA are copied verbatim from the applicant's responses to public comments. MBL was involved in the preliminary drafting of the EA. See (AR 183) (email from Kevin Kotelly of the Corps to Scott Lindell of MBL asking Mr. Lindell whether he would "be agreeable to helping

---

6. Essential Fish Habitat ("EFH") is defined in the Magnuson–Stevens Fishery Conservation and Management Act as "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity." 16 U.S.C. § 1802(10).

7. Plaintiff concedes that, in a section of the EA listing the various public comments submitted about the Project, the USACOE "adequately summarized" FWW's March comments. (Compl.¶ 63.) Plaintiff complains,

though, that "no mention was made of FWW's May 28, 2008 comments." *Id.* FWW's May 28th comments were in response to an email sent by the USACOE to FWW (containing MBL's written response to the comments on the project). The May comments do not raise any new environmental concerns. Rather, they reiterate the same environmental concerns raised in the March comments and offer a rebuttal to the MBL's responses. *See* (AR 102–109.)

[Mr. Kotelly] begin writing-up some of the boilerplate background information that [Mr. Kotelly] will eventually need to write"); (AR 171–179) (email correspondence including pieces of the EA which Mr. Lindell drafted).

There is, however, evidence that the Corps gathered opinions from other state and federal agencies. Most notably, both the Massachusetts Department of Marine Fisheries ("MA DMF") and the National Marine Fisheries Service ("NMFS"), two government agencies with responsibility and expertise over the areas of concern, "signed off" on the project. (AR 27, 72, 110.) On March 24, 2008, MA DMF wrote to the Corps, stating that "[a]fter careful review" of the permit application, the agency had "no recommendations" for the Project. (AR 27, 72.) After reviewing the Public Notice describing the Project, NMFS asked the Corps to supply additional information to aid its evaluation of the Project's potential impacts on EFH and associated marine resources. (AR 74–75.) However, after reviewing MBL's replies to the public comments, NMFS felt that its questions had been adequately answered and concluded, "It does not appear that this project is likely to have more than a minimal and temporary impact on Essential Fish Habitat and that any associated adverse impacts have been minimized through the project design. No EFH conservations are warranted and no further EFH consultation is needed." (AR 27, 110.)

In some circumstances, the fact that an applicant wrote the EA would be a signal that the agency did not take a hard enough independent look. Here, though, MBL's analysis of the public comments and explanation as to why the Project's short duration and small size lessen its potential environmental impacts seems compelling, particularly since the state and federal agencies agreed with it and MBL itself has such extensive expertise. Founded 120 years ago, MBL is the oldest marine biological laboratory in the western hemisphere; it regularly conducts research with a variety of marine organisms, with applications to biomedical research, ecosystem function, and aquaculture. The head of the Project, Mr. Scott Lindell, holds a Master's Degree in Fisheries and Wildlife Biology and has extensive experience in the field of aquaculture research and practice. (Lindell Aff. ¶¶ 4–6.)

b. *The FONSI and Significance Factors*

Plaintiff argues that the Corps was required to prepare an EIS because several characteristics of these projects make their environmental impacts "significant" as that term is defined by statute and regulations.

When evaluating whether a proposed action "significantly" affects the quality of the environment (and thus requires an EIS), CEQ regulations instruct agencies to consider both the context of the action and the intensity, or severity, of the impact. *See* 40 C.F.R. § 1508.27. The regulations also articulate a number of factors which an agency should consider when evaluating the intensity of a proposed project. 40 C.F.R. §§ 1508.27(b)(1)-(10). Plaintiff focuses on three factors in particular, insisting that the project will impact "ecologically critical areas," is "highly controversial," and involves "highly uncertain or involve unique or unknown risks." 40 C.F.R. §§ 1508.27(b)(3)-(5).

CEQ regulations instruct an agency to consider "[u]nique characteristics of the geographic area such as proximity to ... ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). Plaintiff contends that the Project could affect EFH for a number of fish species and juveniles living on the sandy bottom. In particular, noting that

many juvenile fish "live in the sandy bottom of Buzzards Bay," Plaintiff expressed concern that these juveniles would be harmed by changes to the sea floor prompted by the Aquadome project. (AR 91.) Plaintiff explained that when fish are raised in cages in the ocean, the waste and uneaten food that builds up on the sea floor can create "anoxic conditions, with oxygen depleted from the sediment." (AR 91.) Plaintiff cited studies suggesting that such conditions can have a negative impact on fish juveniles and seagrass and that the impact can be felt even outside the immediate area of the cage. As such, in its view, the experiment would impact "ecologically critical areas."

The EA explains that the Project "will impact approximately 80 square feet of Essential Fish Habitat (EFH)." (AR 25.) The nearest eelgrass beds will not be affected because they are more than 200 meters away. Any effects on the ecosystem, EFH, and bottom-dwelling fish would be "minor and of short duration." (AR 31–32.) Even at the Project's peak, the amount of feed released will be "about the equivalent nutrient loading of a dozen lobster pots supplied with bait," an amount which is "not substantial." (AR 32.) Video monitoring will be used to ensure that most, if not all, of the food pellets are consumed. (AR 32.) As for waste, the EA explained that, after the first three weeks of confinement, "fish will be free to roam and disperse their waste over a large area." (AR 32.) Moreover, the Corps consulted with NMFS which concluded that the Project would not adversely affect EFH, and the state agency (MA DMF) did not express concern over impacts to the fishery habitat. (AR 27, 29, 110.) Thus, the Corps had sufficient support for its conclusion that "[t]he impacts to waters of the United States ... do not constitute a significant impact," and that, as a result, the Project's proximity to an "ecologically

critical area," did not warrant a finding of NEPA significance. (AR 35.)

■ CEQ regulations also instruct an agency to consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). Courts interpreting this provision have concluded that, in order for a proposed action to be "highly controversial," there must be a "substantial dispute" as to the "size, nature, or effect of an action in the relevant community." *Indiana Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 857–58 (7th Cir.2003) (arriving at this definition after looking at both the language of the regulation and the body of caselaw interpreting it). Mere opposition is not enough to render a proposed project "highly controversial." *See North Carolina v. Fed. Aviation Admin.*, 957 F.2d 1125, 1133–34 (4th Cir.1992) (rejecting the notion that "controversial" must be equated with opposition and stating that, otherwise, the "outcome would be governed by a 'heckler's veto' ").

The Corps maintains that this case differs from those where courts have found the controversy factor implicated. Such cases typically involve objections by multiple persons and government agencies with specialized training and expertise in the relevant subject matter who, through their opposition, have brought to light a serious scientific disagreement over the proposal's environmental impact. *See e.g., Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193–4 (9th Cir.1988) (concluding, in a case where Plaintiff "introduced affidavits and testimony of conservationists, biologists, and other experts who were highly critical of the EAs and disputed the [agency's] conclusion that there would be no significant effects," that the proposal constituted the "precise type of 'controversial' action

for which an EIS must be prepared"); *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.,* 681 F.2d 1172, 1182 (9th Cir.1982) (concluding that an action was "highly controversial" when numerous conservationists, biologists, and knowledgeable individuals, as well as two state agencies, all expressed disagreement with the EA's conclusions). Here, there is little evidence that the project is "highly controversial." There were several other citizen groups, agencies, and individuals who expressed concerns or raised questions about the Project during the comment period. Plaintiff, however, seems to be a lone voice in its objections to the adequacy of the EA and FONSI at this point in time. *Accord Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986–87 (9th Cir. 1985) (concluding that an action was not highly controversial when there was "virtual agreement . . . among local, state, and federal government officials, private parties, and local environmentalists . . . [and][o]nly appellant and its two experts [were] critical" of the EA).

■ CEQ regulations also instruct an agency to consider "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). Plaintiff argued that the "uncertain effects" factor was implicated because the intensity of the effects of aquaculture experiments are "location specific, and require a thorough analysis of the site characteristics . . . in conjunction with the intended species and feeding practices." (AR 90.) Plaintiff also contends that because it was not aware of any study investigating the effect of a cage that sits directly on the sea floor, this type of experiment involves "unique or unknown risks." (AR 90.) However, in multiple places throughout the EA, the Corps addresses the impact that the cage will have on the floor and concludes that "[a]ny effects will be naturally erased within a few weeks of the end of the project." (AR 35.)

Plaintiff also contends that the various concerns it has raised and the scientific studies it has introduced *at least* render the effects of the project "uncertain." However, each study is distinguishable and none involves a fish experiment of such a small size or temporal duration. *See e.g.,* (Pl.'s Ex. 11) (study conducted at three fish farms in the Mediterranean, each of which had been operating for at least ten years, and involved 20 to 24 net cages); (Pl.'s Ex. 15) (study conducted at four fish farms in the Mediterranean, with a range of 10 to 18 years of operation, and involving 16 to 24 net cages).

In its evaluation of the intensity factors, the Corps stated that the "impacts of the proposed project are not uncertain, they are readily understood based on past experiences the Corps has had with similar projects. These impacts are discussed above." (AR 36.) Plaintiff makes much of the fact that the EA itself does not discuss any similar projects with which the Corps has had experience. (Compl. ¶ 73; Pl.'s Mem. 9.) While the Corps should have identified which projects it was relying on in the EA, the expanded record before the Court refers to a large scale commercial salmon farm in Maine for which a permit was granted. In light of the record as a whole, this omission is not enough to undermine the validity of the EA.

### 2. Alternatives & Conditions

■ Plaintiff also alleges that the Corps failed to comply with its obligations, under NEPA and implementing regulations, to include a discussion of reasonable alternatives in the EA and appropriate conditions in the permits it issues.

Acknowledging that the EA contains a discussion of both a "No Action" and "Full Build" alternative, (AR 25–26), Plaintiff focuses on the fact that the EA does not specifically discuss an "Issue with Modifications" option. *See* 33 C.F.R. Part 325, App. B, § 7a ("The decision options available to the Corps, which embrace all of the applicant's alternatives, are issue the permit, issue with modifications, or deny the permit.").

The EA does discuss alternative locations, cage modifications, and better monitoring. A discussion of both alternative sites and cage sizes is contained within the "Full Build Alternative" discussion:

> All other sites were deficient in some way .... The Applicant states that no other site within 10 miles of Woods Hole provides the favorable combination of [factors].... The AquaDome proposed to be used is the smallest that is commercially available. Downsizing or altering the configuration is not feasible at this time.

(AR 25–26.) Modifications were also discussed, but rather than being located in the obvious place (the "Alternatives" section), these discussions are spread throughout the document. (*See, e.g.,* AR 31) ("The fish population will pass a health inspection prior to release.... Avoiding bird entrapment or entanglement is an important design consideration for Aqua-Dome. On the portion of the AquaDome where the Applicant had planned to remove the mesh to permit the fish to swim freely, they now plan to install 4–inch–square plastic-coated wire mesh, which will allow the fish to swim in and out but exclude diving birds.").

It appears that the Corps considered "Full Build" to be the Project with the modifications that MBL had agreed to implement following the public comment period. Plaintiff maintains that, by not in-

cluding these mitigation measures in the "proper" places, the Corps effectively left the implementation of these measures to MBL's discretion, in violation of Corps regulations. See 40 C.F.R. § 1505.3 (stating that "[m]itigation ... and other conditions ... committed as part of the decision shall be implemented by the lead agency ... [who] shall [i] nclude appropriate conditions in grants, permits or other approvals"). In response, the Corps points to Condition 5 in the permit which states that a permit can be suspended, modified, or revoked if "information provided by [the Applicant] ... proves to be false, incomplete, or inaccurate." (AR 5.) Were MBL to backpedal on the mitigation measures it committed to, the Corps maintains that it could suspend, modify, or even revoke the permit.

Plaintiff has a point that the EA could have been written to better explain "alternatives." Still, the touchstone here is whether the Corps evaluated appropriate alternatives given the small scope of the Project. The arguments put forth by Plaintiff are simply too formalistic and fail to demonstrate that the Corps did not properly consider alternatives.

*3. Circulating a Draft FONSI*

 Plaintiff also alleges that the Corps violated NEPA by failing to circulate a draft FONSI for public comment. (Compl. §§ 105–108.) CEQ regulations require that, "in certain limited circumstances," an agency must make a FONSI available for public review before it makes the final decision as to whether to prepare an EIS. 40 C.F.R. § 1501.4(e)(2). One of these "limited circumstances" is when "[t]he nature of the proposed action is one without precedent." 40 C.F.R. § 1501.4(e)(2)(ii). Because the CEQ regulations are concerned with environmental impacts, the question of whether some-

thing is "without precedent" is limited to whether there is something unprecedented about the way a particular project will impact the environment. See *Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 115 (1st Cir.2005).

Plaintiff contends that the Project is "without precedent" for two reasons. First, Plaintiff states that "no finfish aquaculture operations have ever been permitted in Buzzards Bay." (AR 109; Pl.'s Mem. 17.) In response, the Corps points out that it has been involved in permits for aquaculture in New England, particularly for commercial Atlantic salmon operations of a much larger scale than the Project. (AR 36; USACOE Opp'n 15.) This prior permitting in the region provided sufficient grounds for the Corps' conclusion that the nature of the Project was not "without precedent."

Second, Plaintiff states that there have never been other experiments attempting to train fish to respond to human cues in the wild. (AR 109; Pl.'s Mem. 17.) While most public comments focused on the aquaculture aspect of the project, Plaintiff had also raised the possibility that wild fish, after the panels of the cage are removed, will consume the feed that MBL releases into the water. (AR 92.) Plaintiff characterized the Project as an attempt "to condition wild fish to get their food from [a] feeding tube ... [and] respond to human cues," and declared the Project to be a "terrible experiment" because fish that become conditioned to expect food from humans may stop looking for food on their own and ultimately suffer when the food source is no longer available. (AR 92–93.)

The Corps, however, concluded that the wild fish would not be impacted by the available food and acoustic signals. The Corps stated: "Since black sea bass are not a naturally schooling fish, it is unlikely that wild fish will mimic the hatchery-released fish and move to the feeding site with them." (AR 32.) The Corps also noted that wild fish typically reject pelleted food, thus reducing the chances that they would become dependent upon such feed, and stated, "[t]he chances of training wild fish to eat artificial food with this experiment are extremely unlikely and any occurrence would be an unusual finding." (AR 32.) Plaintiff has submitted no evidence from any expert to refute this contention. Having considered and rejected this theory of harm to wild fish, the Corps' decision that the Project would not lead to unprecedented impacts on the natural environment was neither arbitrary or capricious, nor an abuse of discretion. See 40 C.F.R. § 1501.4(e)(2)(ii); *Alliance to Protect Nantucket Sound, Inc.*, 398 F.3d at 115.

### D. Irreparable Harm

Even if Plaintiff had established a likelihood of success on the merits of one or more of his claims, to have a chance at securing a preliminary injunction, he would still need to demonstrate that there is a "significant risk" of irreparable harm if the injunction is denied. *Nieves–Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir.2003) ("[P]laintiffs bear the burden of demonstrating ... a significant risk of irreparable harm if the injunction is withheld."); *see Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."); *Ross–Simons*, 217 F.3d at 13 ("Irreparable harm is an essential prerequisite for a grant of injunctive relief."). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated

fears of what the future may have in store." *Charlesbank Equity Fund II,* 370 F.3d at 162; *see Matos ex rel. Matos v. Clinton Sch. Dist.,* 367 F.3d 68 (1st Cir. 2004) ("A preliminary injunction should not issue except to prevent a real threat of harm.... A threat that is either unlikely to materialize or purely theoretical will not do.") (citations omitted).

In assessing irreparable harm, the Court should consider not only harm to the environment, but also the harm that flows from uninformed agency decision-making. The First Circuit has held that "when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." See *Sierra Club v. Marsh,* 872 F.2d 497, 500 (1st Cir.1989) (quoting *Massachusetts v. Watt,* 716 F.2d at 952 (explaining that this type of injury "reflects the very theory upon which NEPA is based—a theory aimed at presenting governmental decision-makers with relevant environmental data *before* they commit themselves to a course of action")). In *Watt* and *Marsh,* the First Circuit instructed district courts considering a request for a preliminary injunction in a NEPA case to "take account of the potentially irreparable nature of this decisionmaking risk to the environment." *Marsh,* 872 F.2d at 501. At the same time, however, the First Circuit has repeatedly emphasized that its holdings in *Watt* and *Marsh* do "not mean that a likely NEPA violation automatically calls for an injunction; the *balance of harms* may point the other way." *Conservation Law Found., Inc. v. Busey,* 79 F.3d 1250, 1272 (1st Cir.1996) (internal quotation marks omitted).

▇ Plaintiff lacks any affidavits from scientists or experts proving that the Project presents a real threat of irreparable harm to the environment. In both its comments to the Corps and its briefing to this Court, Plaintiff has cited to numerous scientific studies, but these studies contain findings that are not clearly transferable to the situation at hand.

Plaintiff's theories of irreparable harm are flawed. Plaintiff argues that, once the Aquadome is in the water (and especially once fish have been placed into the cage), juvenile fish living on the ocean floor could be harmed by changes in the chemical composition of the sediment caused by the build up of waste and uneaten food. The first problem with this theory of harm is that there is no evidence that any juvenile fish live in the affected area. At best, there is evidence that quahogs may live in the sandy bottom. At the hearing, MBL stated that it did not know whether any juvenile fish were nurtured in the benthic area of the Aquadome. While it admitted that there could very well be some juveniles in the area, MBL stated that it did not believe that there were significant numbers of juveniles and that they consulted with three agencies that also don't believe there are significant numbers. *See* (AR 27.) Even if there are some juveniles, the Aquadome will only impact, at most, 80 square feet of Essential Fish Habitat. (AR 24–25) (stating that the directly impacted bottom surface area will be 50 square feet but that approximately 80 square feet of Essential Fish Habitat will be affected by the Project).

Moreover, as stated earlier, the majority of studies relied on by Plaintiff address the environmental impacts of large-scale commercial fish farms. MBL has effectively explained how its project differs dramatically in both size and duration from these commercial fish farms. MBL asserts that while "typical" salmon farms in Maine have cages extending over several acres of water and contain hundreds of thousands

of fish, the Project's enclosure is only 32 feet in diameter and will contain only 5,000 fish. (AR 31; MBL Opp'n 13–15; Lindell Aff. ¶ 9.) In addition, while fish in commercial farms spend approximately 18 months in the ocean before being harvested, the fish in the Project will spend only up to one month in the Aquadome. (MBL Opp'n 13–15; Lindell Aff. ¶ 9.) Because of the shorter duration and smaller size of the Project, the amount of food (and presumably waste) released into the water will be a fraction of that released in large-scale operations. *Id.*

To counter the defendants' duration-based distinction, Plaintiff points to a study demonstrating that juvenile sea bass experienced a decreased growth rate and 50 percent mortality after just four days of exposure to low oxygen conditions. (Pl.'s Ex. 16). However, as the Corps points out, there is still a missing link: Plaintiff fails to present any evidence that the oxygen levels in the area of the Aquadome will approximate the levels at which effects on the fish were detected in the study.

Plaintiff also contends that the wild fish could suffer irreparable harm when they too are conditioned to respond to the "dinner bell" and become dependent on the pelleted feed. MBL and the Corps responded that because the sea bass are not naturally schooling and typically reject pelleted food, it is "extremely unlikely" that wild fish would mimic the hatchery-raised fish and any occurrence to the contrary would "be an unusual finding." (AR 32.) Plaintiff does not refute the notion that black sea bass are not a naturally schooling fish, but instead points to studies demonstrating fish learning feeding behaviors from other fish. (Pl.'s Exs. 35–36.) While these studies may lend support to the theory that fish are capable of learning feeding behaviors from other fish, they fall far short of demonstrating that the wild fish that inhabit the affected area of Buzzards Bay will likely mimic the actions of those fish released as part of the Project.

Plaintiff also points to a study demonstrating that wild fish aggregate around cages and consume pelleted food regularly. (Pl.'s Ex. 37) (study explaining that "wild fish[ ] tend to concentrate around fish farms" and that "[d]irect visual underwater observations confirmed that feed pellets are quickly consumed [by wild fish] as soon as they leave the netpen"). Like Plaintiff's other scientific evidence, however, this study was conducted in circumstances far different from those at issue here. Set in an area of the Mediterranean Sea where "[i]ntensive finfish agriculture" has been carried out for more than a decade, this study examined the behavior of wild fish around net-pens containing 22,000 fish. *Id.* Moreover, the study was not examining the impact that the food pellets had on wild fish, but rather the influence that the consumption of food and waste from the fish farms by wild fish had on the sediment below. Given the short duration and small size of the Project, there is no evidence of a significant environmental impact even if wild fish do congregate at the Aquadome.

Alternatively, Plaintiff also suggests that, upon the release of the fish, the wild fish population could suffer irreparable genetic harm. This argument, however, is undermined by MBL's clarification of the record that the broodstock consisted of 53 parent fish,[8] that the fish underwent health inspections prior to being placed in the

---

8. The EA stated that the fish were spawned from over 30 locally-caught parent fish. (AR 32.) Plaintiff cited a study stating that at least 50 parent fish were needed to protect against harm. *See* (Pl.'s Ex. 34.) MBL has since clarified that 53 parent fish were used. (Lindell Aff. ¶ 14.)

Aquadome, and that MA DMF has issued MBL the requisite permits authorizing both the holding and ultimate release into the wild of the Project's black sea bass. (Lindell Aff. ¶¶ 13–15.)

Finally, Plaintiff argues that the irreparable harm suffered is the "added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis with prior public comment of the likely effects of their decision up their environment." (Pl.'s Mem. 17–18.) A prerequisite for advancing this theory of injury, however, is a finding that the Plaintiff has demonstrated a likelihood of success on its NEPA claim. This Court found just the opposite. Accordingly, this Court concludes that Plaintiff has not satisfied the irreparable harm requirement. *See Friends of Magurrewock, Inc.*, 498 F.Supp.2d at 377–78.

In sum, the Court concludes that Plaintiff has not demonstrated "irreparable harm."

## E. Balancing Scales

■ Before issuing a preliminary injunction, a court must engage in a balancing of hardships, asking "whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs." *Weikert*, 504 F.3d at 5.

The burden to the Corps is not substantial, as an injunction would simply require it to temporarily revoke a permit it has issued and conduct a full environmental assessment. *See Nw. Bypass*, 470 F.Supp.2d at 65 (noting that the proposition that a lawsuit challenging the Corps' permitting process in itself provides a hardship within the meaning of the law would "create a 'Catch–22' … [and] cannot be and is not the law").

The burden to MBL, however, is significant. This is a project where time is of the essence. The fish are in the pen; the Project has been federally funded. The subjects of the experiment, black sea bass, are a migratory species and typically leave Buzzards Bay for warmer waters in October. (MBL Opp'n 17; Lindell Aff. ¶ 19.) MBL explains that, to maximize the data gathered, it needs a period of at least eight to twelve weeks after the fish are released from the Aquadome. (MBL Opp'n 18; Lindell Aff. ¶ 19.) Adding to this the three-to-four weeks at the beginning of the Project when the fish are contained within the Aquadome, it becomes evident that the Project needs at least eleven weeks to run its course. If, as MBL represented its intentions at the hearing, the fish were placed in the Aquadome at the end of the week of July 14th, the Project is already bumping up against the nature-imposed October deadline.

Importantly, MBL explains that this is not a project that can be started, stopped, and then started again. Thus, if this Court issued a preliminary injunction today, MBL would likely have to end the experiment (and release the fish into the wild without plans to lure them back with sound) before ever testing its bass-line theory. Pulling the fish out of the Aquadome and returning them to the laboratory tanks is impractical because, even before being placed in the Aquadome, the fish had begun to outgrow their tanks. (Lindell Aff. ¶¶ 20–21.) Moreover, even if appropriate tanks could be found, at a cost of over $1000 per week, the NOAA funds would be quickly exhausted, and MBL does not have any other funding sources to re-do the Project at a later date. (Lindell Aff. ¶ 20.)

Plaintiff does not offer strong scientific evidence of significant harm to the environment other than scientific studies not

directly on point. Accordingly, this Court concludes that the demonstrated harm to MBL from granting the injunction exceeds any harm to the Plaintiff from failing to grant it.

## F. Public Interest

█ Finally, the public interest weighs in favor of denying the injunction.

While protecting Buzzards Bay from environmental harm is in the public interest, the Project is funded with taxpayer money via a grant from NOAA's National Marine Aquaculture Initiative. (Lindell Aff. ¶ 10.) The Project was one of approximately ten projects selected from over one hundred applications in a nationwide competition, in which each proposal was peer-reviewed and required to "demonstrate its potential for scientific, technological, and commercial advancement." (Lindell Aff. ¶ 10.) NOAA's decision to fund the Project indicates that it considers the Project to be in the public interest and worthy of what are limited government funds.

As the Corps and MBL both emphasize, a goal of this Project is to improve existing aquaculture practices and stock enhancement efforts. If successful, the Project could lead to the adoption of methods that lessen the negative environmental impacts of commercial fish farming. (USACOE Opp'n 23.) For example, if the Project's ocean trial indicates that free-roaming fish can be trained to respond to a specific acoustic signal and move to a specific place for food, "the public may have a model for drastically reducing the impact of concentrated fish farming operations by letting fish be dispersed throughout a region." (MBL Opp'n 19.) This model of fish farming could reduce the negative environmental impacts discussed in the studies cited by Plaintiff. (MBL Opp'n 19.)

*ORDER*

The Plaintiff's Motion for a Preliminary Injunction (Docket No. 3) is ***DENIED.*** The motion to strike (Docket No. 143) is ***DENIED.***