# United States Court of Appeals
## For the First Circuit

No. 99-2223

ROSS-SIMONS OF WARWICK, INC., ET AL.,

Plaintiffs, Appellees,

v.

BACCARAT, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Selya, Circuit Judge,

Cyr, Senior Circuit Judge,

and Stahl, Circuit Judge.

Jeffrey A. Oppenheim, with whom Kane Kessler, P.C., Joseph V. Cavanagh, Jr. and Blish & Cavanagh were on brief, for appellant.
Steven E. Snow, with whom Brian C. Newberry and Partridge, Snow & Hahn LLP were on brief, for appellees.

June 22, 2000

**SELYA, Circuit Judge.** A few years ago, we ventured into the high-end retail market for fine crystal and upheld a preliminary injunction issued in favor of a group of affiliated retailers (collectively, "Ross-Simons") against Baccarat, Inc. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12 (1st Cir. 1996) (Ross-Simons I). This appeal, in which Baccarat asks us to dissolve a permanent injunction compelling it to continue dealing with Ross-Simons, requires us to revisit those purlieus. As before, Baccarat fails to make the sale.

## I.  BACKGROUND

Because we previously rehearsed the pertinent facts, see id. at 14-15, we provide here only a simple sketch, embellished with the new developments relevant to this appeal.

Baccarat distributes a prestigious line of French lead crystal. For its part, Ross-Simons sells a variety of items, including crystal and tableware, at widely dispersed retail stores and through an enormously successful direct-mail catalog. In the fullness of time, Baccarat, apparently disturbed by Ross-Simons's aggressive pricing policies, took steps to block the latter's access to Baccarat's wares. Ross-Simons responded by filing an antitrust suit.

That declaration of war yielded an uneasy peace: the parties settled out of court, executing a written agreement on

-3-

November 24, 1992 (the "1992 Agreement"). Pursuant to that agreement, Ross-Simons dismissed its action without prejudice. In return, Baccarat appointed Ross-Simons as an authorized dealer "entitled to purchase and resell [Baccarat crystal] at such prices and upon such terms as are available to other authorized dealers." Baccarat also agreed "not [to] terminate Ross-Simons' status as an authorized dealer, nor otherwise discriminate against Ross-Simons in any manner, as a result of any failure or refusal by Ross-Simons to adhere to suggested resale prices or due to Ross-Simons' marketing through direct-mail catalogs." Although the 1992 Agreement contained no durational term, it specifically provided that changed circumstances, in and of themselves, would not suffice as a basis for extinguishment of its covenants and conditions.

In late 1994, shortly after new management assumed control of Baccarat, this fragile relationship shattered. Concerned about maintaining the luster of its name, Baccarat instituted a new authorized dealer program, which, among other things, precluded dealers from advertising Baccarat products in any printed medium that — like the Ross-Simons catalog — promoted a sizeable proportion (more than 25%) of "off-price" items. When Ross-Simons balked, Baccarat refused to fill its orders.

The hostilities resumed: Ross-Simons again filed suit, this time alleging a breach of the 1992 Agreement. Citing diversity of citizenship and the existence of a controversy in the requisite amount, Baccarat removed the case to Rhode Island's federal district court. See 28 U.S.C. §§ 1332(a), 1441. The court, acting through Judge Boyle, issued a preliminary injunction directing Baccarat to supply Ross-Simons pendente lite. We upheld this order. See Ross-Simons I, 102 F.3d at 12.

The battle raged on, and the lower court, this time acting through Judge Lagueux, subsequently rejected Baccarat's motion for summary judgment. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 182 F.R.D. 386 (D.R.I. 1998) (Ross-Simons II). Then, following a three-day bench trial, Judge Lagueux entered a permanent injunction in favor of Ross-Simons. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 66 F. Supp. 2d 317 (D.R.I. 1999) (Ross-Simons III). Baccarat again appeals.

**II. ANALYSIS**

We take up each tine of Baccarat's three-pronged attack on the lower court's disposition. In doing so, we apply the substantive law of Rhode Island. See, e.g., Fithian v. Reed, 204 F.3d 306, 308 (1st Cir. 2000); Daigle v. Maine Med. Ctr., 14 F.3d 684, 689-90 (1st Cir. 1994).

## A. **Duration of the 1992 Agreement**.

The centerpiece of Baccarat's appeal is its contention that the district court erred by not placing a finite temporal limit on the decree. This contention springs from the concept that the 1992 Agreement, if it has not already expired, will become terminable after the passage of a commercially reasonable period of time. The district court rejected this contention, ostensibly relying on the plain language and purpose of the contract. See Ross-Simons III, 66 F. Supp. 2d at 325-26. Importantly, however, the court also found as a fact that when the parties entered into the 1992 Agreement, they intended to establish a long-term relationship. See id. at 320.

We generally review the grant or denial of injunctive relief for abuse of discretion. See Ross-Simons I, 102 F.3d at 16. Withal, the standard of review is multi-dimensional and may vary depending on the specific issue under consideration. See Langlois v. Abington Housing Auth., 207 F.3d 43, 47 (1st Cir. 2000). Here, we review the lower court's interpretation of the language and purpose of the contract de novo and its findings of fact for clear error. See United States Liab. Ins. Co. v. Selman, 70 F.3d 684, 687 (1st Cir. 1995). Moreover, we do not consider ourselves bound by the trial court's rationale, but may affirm its judgment for any valid reason that finds support in

-6-

the record.  See Phillips Exeter Academy v. Howard Phillips
Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999); Garside v. Osco
Drug, Inc., 895 F.2d 46, 48-49 (1st Cir. 1990).

The district court's reasoning spans its two most
recent published opinions.  At the summary judgment stage, the
court rejected Baccarat's argument that the 1992 Agreement was
too indefinite to be enforceable, holding instead that the
agreement fell into the category of contracts terminable upon
the happening of a specific event.  See Ross-Simons II, 182
F.R.D. at 395-97.  In reaching this conclusion, the court relied
heavily on Payroll Express Corp. v. Aetna Cas. & Sur. Co., 659
F.2d 285 (2d Cir. 1981).  The relevant insurance contract in
that case did not specify a duration but stated only that it was
terminable by the insurer for nonpayment of premiums.  See id.
at 288-89.  New York's policy against perpetual commitments
notwithstanding, the Second Circuit held that the insurer could
not cancel the policy as long as the insured continued to pay
the premium.  See id. at 292.  Embracing the logic of Payroll
Express, the court below determined that the 1992 Agreement, by
committing Baccarat to sell to Ross-Simons "at such prices and
upon such terms as are available to other authorized dealers,"
implicitly provided for termination upon the occurrence of a
particular event, i.e., Ross-Simons's breach of these standard

-7-

terms.  See Ross-Simons II, 182 F.R.D. at 396.  Thus, the 1992 Agreement was sufficiently definite to be enforceable.  See id. at 396-97.

The difficulty with this reasoning is that every enforceable contract involves a bargained-for exchange of obligations, the material breach of which by one party gives the other party a right to terminate.  See, e.g., Ahearn v. Scholz, 85 F.3d 774, 783 (1st Cir. 1996); Pelletier v. Masse, 143 A. 609, 610 (R.I. 1928); see also Restatement (Second) of Contracts § 237 (1981).  If the existence of an affirmative commitment, without more, automatically converts a contract of indefinite duration into a contract terminable upon the happening of a specific event, then the presumption against perpetuity becomes illusory.  Broadly postured, this would conflict with Rhode Island law, as that state's courts are quite clear that, in the employment context at least, a contract silent as to duration is terminable at will.  See Salisbury v. Stone, 518 A.2d 1355, 1360 (R.I. 1986); Booth v. National India-Rubber Co., 36 A. 714, 715 (R.I. 1897).

Of course, the 1992 Agreement was an agreement for the settlement of a lawsuit, not an employment agreement — a distinction upon which the district court expressly relied.  See Ross-Simons III, 66 F. Supp. 2d at 324-26; Ross-Simons II, 182

F.R.D. at 395-97. The central goal of a settlement agreement is to fashion a final and permanent resolution of a dispute, see City of Homestead v. Beard, 600 So. 2d 450, 454 (Fla. 1992); cf. Mathewson Corp. v. Allied Marine Indus., 827 F.2d 850, 857 (1st Cir. 1987) ("There is an institutional interest in the solemnity of [settlement] agreements, in bringing certainty to the process, and in minimizing the opportunities for lawyers and litigants alike to act as Monday morning quarterbacks."), so applying the presumption against perpetual obligations to settlement agreements would be an extremely awkward fit. Limited to this one small corner of contract law, the district court's "implied termination clause" rationale might well be appropriate.

We need not resolve this question here. After all, it is common ground that where the presumption against perpetuity applies, it can be rebutted by evidence that the parties intended a permanent arrangement. See 1 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts § 38, at 113 (3d ed. 1957) (stating that "unless the circumstances show a contrary intention, [courts will] interpret a promise which does not . . . state the time of performance as intending performance in a reasonable time") (emphasis supplied); see also School Comm. v. Board of Regents for Educ., 308 A.2d 788, 790

-9-

(R.I. 1973) (explaining that the parties' intentions — as gleaned from the course of prior dealings or other surrounding circumstances — can rebut the presumption that an employment contract without a durational term is terminable at will). In this instance, such evidence abounds.

The 1992 Agreement was designed, first and foremost, to settle an antitrust suit in which Ross-Simons claimed that Baccarat had refused to deal with it due to its practice of undercutting suggested retail prices. This is evident from the title of the agreement ("Agreement of Compromise and Settlement"), the pact's delineation of its purpose, and the pact's description of the underlying dispute. In exchange for dismissal of that action, Baccarat installed Ross-Simons as an authorized dealer and pledged not to discriminate against it on the basis of its pricing or marketing policies. These facts support the conclusion that the parties intended the 1992 Agreement to last for an indefinite period of time. Cf. Rossmassler v. Spielberger, 112 A. 876, 880 (Pa. 1921) (inferring an absolute and indefinite obligation from the subject matter of a contract with no period of duration). As Judge Lagueux astutely noted, the arrangement was akin to an antitrust consent decree — a device that often mandates

compliance for an indefinite duration.  See Ross-Simons III, 66
F. Supp. 2d at 325.

Several other provisions of the 1992 Agreement favor
this reading.  For one thing, as we observed before, both
Baccarat and Ross-Simons "must have understood that the 1992
Agreement would operate at some length because they specifically
provided . . . that each party assumed the risk of changes in
the operative facts and relinquished any right to terminate the
agreement on the basis of such factual shifts."  Ross-Simons I,
102 F.3d at 18.  For another thing, Baccarat promised that "in
the future" it would consider Ross-Simons's applications for
additional store locations under the same standards generally
applied to other dealers — and it did not place any restriction
on how far into the future this obligation would extend.
Finally, the 1992 Agreement provided that its benefits would
inure to the parties' "successors and assigns."  Viewed in the
ensemble, these forward-looking provisions suggest that the
parties envisioned a lasting relationship.

The attendant circumstances also are relevant to a
determination of the parties' mutual intent.  See Johnson v.
Western Nat'l Life Ins. Co., 641 A.2d 47, 48 (R.I. 1994) (per
curiam).  Here, those circumstances push in the same direction
as the provisions of the 1992 Agreement.  Indeed, the former

-11-

president of Baccarat, who negotiated the 1992 Agreement on its behalf, testified that he had discussed with his opposite number at Ross-Simons Baccarat's history of doing business with its dealers on a long-term basis (although Baccarat began selling its product in the United States in 1949, it had never terminated an American dealer for any reason other than nonpayment) and had described this praxis as consistent with Baccarat's philosophy. In short, the district court's finding that the parties intended a long-term relationship was not clearly erroneous, and this finding buttresses the court's conclusion that the 1992 Agreement was built to last.

In endeavoring to convince us to the contrary, Baccarat relies heavily on our decision in Puretest Ice Cream, Inc. v. Kraft, Inc., 806 F.2d 323 (1st Cir. 1986). Its reliance is mislaid. In that case, we applied Indiana law and ruled that a distributorship contract of indefinite duration was terminable at will. See id. at 324. Passing the point that Rhode Island law is not so clear, see Wayne Distributing Co. v. Schweppes U.S.A. Ltd., 352 A.2d 625, 626-27 & n.1 (R.I. 1976) (reserving determination of the rule to be applied to open-ended distributorship agreements), the fact remains that the presumption against perpetual commitments is rebuttable, see School Comm., 308 A.2d at 790. Moreover, we are confronted here

not with a distributorship contract, but with an agreement intended to inter an antitrust dispute.  The promise to forbear from allegedly illegal activity in exchange for dismissal of a lawsuit is more plausibly intended to be permanent than is a naked promise to sell goods for money.

We will not paint the lily.  We hold, without serious question, that the district court did not err by refusing to engraft a finite temporal limit onto the injunction that it issued.

### B.  **Irreparable Harm.**

Irreparable harm is an essential prerequisite for a grant of injunctive relief.  See EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996).  Seizing upon this hoary principle, Baccarat assails the district court's conclusion that Ross-Simons would suffer irreparable harm were injunctive relief denied.  Because "[d]istrict courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief," K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989) (internal quotation marks omitted), this argument faces an uphill climb.

In the end, that steep slope proves insurmountable. It is settled beyond peradventure that irreparable harm can

consist of "a substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons I, 102 F.3d at 19; see also K-Mart, 875 F.2d at 914 ("The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies."). Here, the district court found after a bench trial that Ross-Simons would suffer an "incalculable loss of reputation and prestige" if Baccarat were allowed to go its own way. Ross-Simons III, 66 F. Supp. 2d at 330. Contrary to Baccarat's importunings, this finding was not plucked out of thin air.

Mary Morris, a Ross-Simons vice-president, explained the importance of Baccarat to the retailer's marketing plan in general and to its bridal registry in particular. According to Morris, losing Baccarat would cause fewer couples to register with Ross-Simons, would disappoint former registrants who would like to augment their holdings of Baccarat products, and would hurt Ross-Simons's image in the broader market. The "uniqueness and prestige" that Morris attributed to Baccarat's line was echoed in the testimony of Ross-Simons's president and two senior Baccarat officials.

To be sure, this testimony consists largely of opinions. But opinion evidence, particularly when given by informed witnesses, can be highly probative. See United States

-14-

v. Hoffman, 832 F.2d 1299, 1310 (1st Cir. 1987) (emphasizing the value of experience as "likely the best teacher" anent a witness's qualifications to offer opinion testimony in certain fields).  We cannot say that the district court abused its discretion in crediting such testimony here.

Baccarat's parallel claim that injunctive relief is virtually unprecedented in situations of this sort does not withstand scrutiny.  In fact, "injunctions against contract breach are common where there is some reasonable doubt about whether damages can be sufficient."  Almond v. Capital Props., Inc., ___ F.3d ___, ___ (1st Cir. 2000) [No. 99-2249, slip op. at 12].  Because injuries to goodwill and reputation are not easily quantifiable, courts often find this type of harm irreparable.  See, e.g., K-Mart, 875 F.2d at 915; Camel Hair & Cashmere Inst. v. Associated Dry Goods Corp., 799 F.2d 6, 14-15 (1st Cir. 1986).  Of particular relevance here, "several courts have recognized that the loss of a prestigious brand or product line may create a threat of irreparable injury if it is likely that customers (or prospective customers) will turn to competitors who do not labor under the same handicap."  Ross-Simons I, 102 F.3d at 20 (collecting cases); see also Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907-08 (2d Cir. 1990) (explaining that stopping "the delivery of a unique

product . . . almost inevitably creates irreparable damage to . . . good will").

### C.  Scope of the Injunction.

Baccarat's fallback position is that, even if some form of injunctive relief was appropriate, the injunction entered by the lower court was overly broad and ambiguous to boot.  We test the scope of an injunction for abuse of discretion.  See Signtech USA, Ltd. v. Vutek, Inc., 174 F.3d 1352, 1356 (Fed. Cir. 1999); Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998).  We discern none in this instance.

Injunctions must be tailored to the specific harm to be prevented.  See Cok v. Family Court, 985 F.2d 32, 34 (1st Cir. 1993) (per curiam); Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697, 700-02 (1st Cir. 1987).  The district court found that Baccarat violated the 1992 Agreement in two ways: (1) by constructively terminating the dealer agreement when Ross-Simons persisted in selling goods below suggested retail prices and in advertising that fact; and (2) by denying Ross-Simons the opportunity to purchase certain "exclusives" at least in part for the same reasons.  See Ross-Simons III, 66 F. Supp. 2d at 328-29.  These actions were held to violate Baccarat's contractual pledge to deal with Ross-Simons on the same terms as other authorized dealers and not to discriminate against it

-16-

based on its pricing or marketing practices.  See id.  The harms to be prevented flowed from the danger of future breach, and the injunction entered by the district court mirrored the operative language of the 1992 Agreement.

Baccarat complains bitterly about the imprecision of the language employed, but this complaint rings hollow.  The injunction simply prohibits contract breach or, put another way, specifically enforces the contract.  Perhaps more importantly, Baccarat negotiated and executed the 1992 Agreement, so it hardly can object to the court's ordering specific performance in precisely the same terms.  Cf. SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1103 (2d Cir. 1972) ("There can be no abuse of discretion in framing an injunction in terms of the specific statutory provision which the court concludes has been violated.").

Baccarat also worries that the injunction might be interpreted to prohibit it from offering "exclusives" to any dealer without including Ross-Simons.  In Baccarat's view, this fear renders the injunction fatally ambiguous. We do not agree. In the first place, the injunction simply reiterates the key provisions of the 1992 Agreement; it does not mention exclusives.  In the second place, while the district court did conclude that Baccarat breached the 1992 Agreement by barring

Ross-Simons from one or more exclusive arrangements, Baccarat's jeremiad here conveniently ignores the court's supportable finding that Baccarat was motivated by its disdain for Ross-Simons's pricing and advertising practices. See Ross-Simons III, 66 F. Supp. 2d at 322. Given this finding, it would have been well within the district court's discretion to prohibit Baccarat from using exclusives as a means of disemboweling its nondiscrimination commitments. See NLRB v. Express Publ'g Co., 312 U.S. 426, 435 (1941) ("A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past."). Conversely, nothing in the injunction should be construed as preventing Baccarat from engaging in legitimate test-marketing of a new or unusual product at a small number of outlets unaffiliated with Ross-Simons, so long as its reasons are unrelated to Ross-Simons's pricing or marketing practices.

Finally, the injunction also includes a restatement of the 1992 Agreement's requirement that Baccarat apply its generally applicable standards in considering whether to sell to additional Ross-Simons store locations. On appeal, Baccarat does not specifically object to this inclusion. In all events,

we are satisfied that discrimination against applications for new Ross-Simons stores would be "of the same type or class" as discrimination against preexisting Ross-Simons stores. Express Publ'g, 312 U.S. at 435; accord Brown v. Trustees of Boston Univ., 891 F.2d 337, 361 n.23 (1st Cir. 1989). The provision is, therefore, appropriate.

## III.  CONCLUSION

We need go no further. We think it crystal clear that the district court's entry of a permanent injunction specifically enforcing the parties' earlier settlement agreement is adequately supported by the record. In so holding, however, we do not foreclose the possibility that, in the days to come, Baccarat might justify ending its relationship with Ross-Simons for legitimate reasons unrelated to Ross-Simons's pricing or marketing practices. Of course, the unqualified language of the injunction may require Baccarat (at least as a matter of prudence) to seek permission from the district court before attempting such a termination. Although we do not minimize the weight of this burden, it does not seem unreasonable in view of Baccarat's dogged attempts to evade contractual obligations.

**Affirmed.**

-19-