**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 2, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LABORATORY CORPORATION OF
AMERICA HOLDINGS, d/b/a LabCorp,

      Plaintiff–Appellee,

v.

METABOLITE LABORATORIES, INC.,

      Defendant–Appellant.

No. 10-1194
(D.C. No. 1:04-CV-01662-ZLW-CBS)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before, **LUCERO**, **EBEL**, and **HARTZ**, Circuit Judges.

Laboratory Corporation of America Holdings ("LabCorp") and Metabolite

Laboratories, Inc. ("Metabolite") are parties to a license agreement that provides

LabCorp a sublicense to certain patents for detecting vitamin deficiencies, and a license

to certain "know-how" related to the patented technology (the "Licensed Patents"). After

LabCorp halted royalty payments to Metabolite with respect to a specific test, the

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

"homocysteine-only test," Metabolite and the patent holder brought suit alleging breach of contract and patent infringement. Because infringement damages would not be available if the contract were merely breached, but not terminated, the jury was presented with a special verdict form specifically inquiring as to termination. The jury found that the License Agreement had been terminated with respect to the homocysteine-only test, and the Federal Circuit affirmed.

Although Metabolite won a preliminary injunction against the use of its know-how by LabCorp, LabCorp continued to conduct the test at issue after judgment pursuant to a stipulated stay order. When the case became final, LabCorp filed a second suit seeking a declaration that it was not liable to Metabolite for post-judgment royalties because the License Agreement had been partially terminated. Metabolite filed several counterclaims. The district court granted summary judgment in favor of LabCorp, holding that the jury in the first case found the License Agreement had been terminated as to the homocysteine-only test. On appeal, Metabolite advances several arguments suggesting that the License Agreement was never properly terminated.

Regardless of the strength of these arguments, we conclude that Metabolite is estopped from making them. What Metabolite once called a "termination," it now attempts to relabel a mere "breach." But the first jury found termination, at Metabolite's urging and to LabCorp's detriment, and that finding binds us. Metabolite cannot have its cake and eat it too. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

# I

A full account of the facts of this dispute can be found in the opinion affirming the prior judgment. See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354 (Fed. Cir. 2004). Accordingly, we provide only a summary here.

In 1990, Dr. Robert Allen and others patented a method for detecting certain vitamin deficiencies by using an assay for homocysteine levels. The "'658 patent" was assigned to University Patents, Inc., a company succeeded by Competitive Technologies, Inc. ("CTI"). CTI licensed the patent to Metabolite, a company owned by Dr. Allen. Metabolite in turn sublicensed the patent to Hoffmann-La Roche Inc., the predecessor in interest to LabCorp.

Under the License Agreement between Metabolite and LabCorp,[1] LabCorp obtained a non-exclusive sublicense to use certain "Licensed Patents," along with a license to use "technology and know-how" developed by Metabolite for conducting "Licensed Assays." In exchange, LabCorp agreed to pay Metabolite a 21.5% royalty on Licensed Assays, and a 6% royalty to CTI. The License Agreement allowed LabCorp to terminate "with respect to a particular Licensed Assay" if a more cost-effective method became available, provided that the new method did not infringe on a Licensed Patent. Metabolite was entitled to terminate in the event of a material breach. In both instances, the terminating party was required to provide sixty days notice.

---

[1] Although the License Agreement was actually signed by Hoffmann-La Roche, Inc. and assigned to LabCorp, we will use "LabCorp" throughout for ease of reference.

In 1998, LabCorp began using a test developed by Abbott Laboratories as an alternative to one of the Licensed Assays covered by the License—the homocysteine-only assay conducted on serum. LabCorp informed Metabolite that it would stop paying royalties on that assay, but continued to pay royalties on other Licensed Assays, and on the homocysteine-only assays conducted on urine.

Metabolite took the position that the Abbott test infringed on a Licensed Patent. On May 4, 1999, Metabolite and CTI filed suit against LabCorp alleging breach of contract and patent infringement. Both companies were represented by the same counsel. With respect to the infringement claim, LabCorp asserted an affirmative defense that "Metabolite has licensed LabCorp under the '658 patent, which license has not been terminated." The case proceeded to trial, where Dr. Allen testified that LabCorp's cessation of royalty payments on the homocysteine-only assay constituted an "absolute termination" of "the license agreement with respect to that individual assay." In closing argument, Metabolite's counsel argued that "LabCorp wrongfully terminated the Metabolite license agreement to get out of paying these royalties; and thus, the license agreement evaporates for them."

A jury instruction setting forth the parties' positions described Metabolite's theory of the case as follows:

> LabCorp's termination of the license agreement and discontinuance of its royalty payments with respect to [the homocysteine-only] test constitutes a breach of its contract with Metabolite. And LabCorp's ongoing performance of these tests following its termination of the license

-4-

agreement with respect to those tests, constitutes contributory infringement and infringement by inducement of the patent owned by CTI.

The same instruction noted LabCorp's defense that it "did not terminate the license agreement or any portion of it with respect to homocysteine tests . . . ."

On the special verdict form, question one asked the jury whether "LabCorp is licensed under the '658 patent and that license has not been terminated in whole or in part?" If the jury answered yes to that question, it was directed to determine whether LabCorp breached the license agreement, and to calculate damages arising from that breach. The jury answered "no" to question one, and was thus directed to question five, which asked, "Do you find, by a preponderance of the evidence, that LabCorp breached its license agreement by terminating it with respect to its performance of the Abbott test?" The jury answered that question "yes." It was accordingly instructed to state the damages to Metabolite, which it set at $3,652,724.61. Based on its answer to question five, the jury was also required to determine whether "LabCorp has contributed to or induced infringement of claim 13 of the '658 patent." The jury answered "yes," awarding $1,019,365.01 in damages to CTI. It also found that LabCorp's infringement was willful, and that claims 13 and 18 of the '658 patent were valid. The damages represented the royalty payments calculated between 1998 and the trial.

The district court entered judgment in accordance with the jury's verdict, and doubled CTI's damages pursuant to the patent laws' enhanced damages provision, 35 U.S.C. § 284. In addition, the court entered an injunction prohibiting LabCorp from

conducting homocysteine-only assays.  However, the parties agreed to a stipulated stay order which allowed LabCorp to continue conducting homocysteine-only assays, but required it to pay CTI a 6% royalty, and provide an accounting of all such assays to Metabolite along with a calculation of a 21.5% royalty that might be due on such tests. LabCorp was further required to "secure its obligation to pay such 21.5% amount to Metabolite (in the event it is held liable therefor in this case) with a bond or letter of credit in an amount that increases monthly to equal the accounted-for amount." However, the stipulated stay was expressly made "without prejudice to any party's position or arguments on appeal or otherwise."

On appeal to the Federal Circuit, LabCorp argued there was no evidence presented at trial that the License Agreement had been terminated because neither party complied with the termination provisions contained in that agreement.  In response, Metabolite cited Dr. Allen's testimony that LabCorp's cessation of royalty payments constituted a termination and noted that "§ 4.02 of the license agreement explicitly sets forth a mechanism for termination on an assay-by-assay basis."  The Federal Circuit agreed with Metabolite:

> The jury found that "LabCorp breached the license agreement by terminating it" for the Abbott test.  LabCorp contends that it did not formally terminate the contract, because the contract requires that the licensee provide written notice.  The record contains no evidence of a written termination.  The record does show, however, that LabCorp stopped paying royalties on the total homocysteine tests.  Refusal to pay royalties is a material breach of the license.  See Dow Chem. Co. v. United States, 226 F.3d 1334, 1346 (Fed. Cir. 2000).  A material breach, in turn, constitutes termination even where the license agreement termination

clause does not expressly so provide. See Apex Pool Equip. Corp. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969) (holding that a licensee's material breach implicitly gives rise to a licensor's right to terminate); see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 10 (1st Cir. 2000) ("Every contract involves a bargained-for exchange of obligations, the material breach of which by one party gives the other party a right to terminate."); Restatement (Second) of Contracts § 237 (1981).

Metabolite Labs., Inc., 370 F.3d at 1370.

Following affirmance, Metabolite filed a post-judgment motion seeking to draw on the letter of credit for post-judgment royalties. LabCorp filed a new suit requesting a declaration that it was not liable for those post-judgment royalties. Although the district court indicated that it was inclined to grant Metabolite such royalties, it held that LabCorp's declaratory judgment action provided the appropriate vehicle for considering post-judgment liability. Metabolite then filed counterclaims in that case.

On competing motions for summary judgment in the declaratory judgment action, the district court concluded that the License Agreement was terminable on an assay-by-assay basis but not on a license-by-license basis. It further held that the jury's verdict in the first trial established that the License Agreement had been terminated with respect to the homocysteine-only assay. The court held that the partially terminated License Agreement relieved LabCorp of any obligation to pay post-judgment royalties on homocysteine-only assays, and accordingly granted summary judgment in favor of LabCorp. Metabolite appealed that decision to the Federal Circuit. However, that court ruled that the appeal did not present a disputed question of patent law and transferred the appeal to this court. See Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 599 F.3d

-7-

1277, 1283, 1286 (Fed. Cir. 2010).

## II

We review the grant of summary judgment de novo. Hobbs ex rel. Hobbs v. Zenderman, 579 F.3d 1171, 1179 (10th Cir. 2009). A party is entitled to summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the movant is entitled to judgment as a matter of law. Id.

## A

The parties appear to agree that the jury verdict in the original trial has some estoppel effect. As the district court noted, "[n]either party disputes that [it is] bound by the rulings in the previous case under the doctrine of collateral estoppel." They disagree, however, on what that effect is. LabCorp contends, and the district court agreed, that the jury found the License Agreement to be terminated with respect to homocysteine-only assays. Metabolite argues that the jury instead found that the patent license to conduct homocysteine-only assays was terminated, but the License Agreement was merely breached.[2]

Collateral estoppel has four elements:

---

[2] Several claims raised below are no longer at issue on appeal. Metabolite voluntarily dismissed its counterclaim for unjust enrichment below and does not advance any argument on appeal with respect to its other counterclaims. Accordingly, we consider only Metabolite's contention that the district court erred in holding that the License Agreement does not give rise to a post-judgment obligation to pay know-how royalties. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (issues not raised in briefing are waived).

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation, 975 F.2d 683, 687 (10th Cir. 1992) (citation omitted).  If these criteria are met, the determination made in the prior case "is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."  True v. Comm'r (In re Estate of H. A. True), 390 F.3d 1210, 1232 (10th Cir. 2004) (quotation omitted).

There can be no dispute that the second and third elements of this test are satisfied. The first action became final when the Supreme Court dismissed certiorari as improvidently granted.  See Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 548 U.S. 124, 125 (2006).  And both parties to the present suit were parties to the first case. Metabolite makes one argument that could be construed as related to the fourth prong (which we will address in Section II.C, infra), but the parties' primary disagreement concerns the issue that the jury actually decided.  On that score, we agree with the district court:  the jury determined that the License Agreement was terminated with respect to the homocysteine-only assay.

**B**

We begin with the language of the special verdict form.  That form presented the jury with a type of flow chart, directing the jury to answer certain subsequent questions

-9-

depending on their answers to the initial questions.  The threshold issues for the jury were whether LabCorp had a license under the '658 patent and whether the License Agreement had "not been terminated in whole or in part."  These issues were central to the first trial because they bore directly on CTI's patent infringement claim and LabCorp's affirmative defense of license.

> [I]n cases where a license is plead [sic] as a defense, or where the license defense is anticipated in the complaint, . . . the most expeditious conduct of the trial would necessitate that the license issue be resolved first, for if the license issue is resolved in the defendant's favor the infringement issue is mooted.  In this sense, infringement is conditional upon a license defense when raised.

Air Prods. & Chems. v. Reichhold Chems., 755 F.2d 1559, 1563 (Fed. Cir. 1985).

In other words, the jury had to first find whether LabCorp was licensed to practice homocysteine-only assays before it could decide CTI's infringement claim.  The special verdict form reflects this necessary ordering of proof.  If the jury found that LabCorp was licensed under the '658 patent, and that license had not been terminated, it was directed to a set of questions that would allow it to award damages for breach of contract but not for patent infringement.  If the jury concluded that LabCorp was not licensed under the '658 patent, the jury was instructed to answer a separate set of questions that would allow both contract and patent infringement damages.

The jury indeed found that LabCorp was not licensed, and thus proceeded to the latter set of questions.  First among that set was question five, which asked:  "Do you find, by a preponderance of the evidence, that LabCorp breached its license agreement by

terminating it with respect to its performance of the Abbott test?" The jury answered that question "yes," opening the door for the $1,019,365.01 award for patent infringement, later doubled by the district court, in addition to the $3,652,724.61 it awarded for breach of contract.

Metabolite faces an uphill task in light of the jury's answer to question five. The plain language of that question strongly suggests the jury found that the License Agreement was terminated with respect to the homocysteine-only test. In arguing that the verdict does not estop it from claiming post-verdict damages for breach of the License Agreement, Metabolite contends the jury did not find that the "know-how license" had been terminated, only that the patent license had been terminated. This argument goes to the first prong of the collateral estoppel test, which requires a showing that "the issue previously decided is identical with the one presented in the action in question." Murdock, 975 F.2d at 687 (citation omitted). To award patent infringement damages, the jury was required to find the patent license was no longer in effect regardless of the status of the know-how rights. But Metabolite's contention that the patent and know-how issues were somehow severed is inconsistent with the jury instructions, the evidence and arguments adduced during the first case, and the License Agreement itself.

The jury was instructed on Metabolite's claim that "LabCorp's termination of the license agreement and discontinuance of its royalty payments with respect to [the homocysteine-only] test constitutes a breach of its contract with Metabolite." This instruction does not suggest that LabCorp terminated only a patent license. It states that

-11-

LabCorp terminated the "license agreement . . . with respect to [the homocysteine-only] test." See Jones v. United States, 527 U.S. 373, 393 (1999) (special verdict form should be construed in context of jury instructions as a whole).

Our conclusion that the jury found the entirety of the License Agreement terminated with respect to the homocysteine-only test is cemented by the trial evidence presented by Metabolite. Dr. Allen, Metabolite's principal, testified that LabCorp's actions caused an "absolute termination" of "the license agreement with respect to that individual assay." Similarly, Metabolite's counsel argued that "LabCorp wrongfully terminated the Metabolite license agreement to get out of paying these royalties; and thus, the license agreement evaporates for them." Neither Dr. Allen nor Metabolite's counsel suggested that only the patent license had been terminated.

Metabolite referred to Dr. Allen's testimony in defending the jury verdict on appeal, and convinced the Federal Circuit that "[t]he jury found that 'LabCorp breached the license agreement by terminating it' for the Abbott test." Metabolite Labs., Inc., 370 F.3d at 1370. Metabolite also argued on appeal that "§ 4.02 of the license agreement explicitly sets forth a mechanism for termination on an assay-by-assay basis." That claim is accurate: section 4.02 of the License Agreement does permit assay-by-assay termination. Although Metabolite argues now that a patent license could expire without termination of the corresponding know-how rights, it does not provide any basis to conclude the jury so limited its finding of termination. Rather, the verdict, instructions, evidence, and argument all lead us to the same conclusion: the jury found that the

-12-

License Agreement was terminated with respect to the homocysteine-only assay.

**C**

Second, Metabolite advances an argument that appears related to the fourth prong

of the collateral estoppel test, the requirement that it "had a full and fair opportunity to

litigate the issue in the prior action." Murdock, 975 F.2d at 687 (citation omitted).

Metabolite claims that it could not have sought damages for post-judgment royalties in

the first action. But this contention is incorrect.

> When one party commits a material breach of contract, the other party has a
> choice between two inconsistent rights—he or she can either elect to allege
> a total breach, terminate the contract and bring an action, or, instead, elect
> to keep the contract in force, declare the default only a partial breach, and
> recover those damages caused by that partial breach . . . .

Richard A. Lord, 13 Williston on Contracts § 39:32 (4th ed. 2010). This concept of

election of remedies has been adopted into New Jersey law, which governs the License

Agreement. See Frank Stamato & Co. v. Lodi, 71 A.2d 336, 339 (N.J. 1950).

As outlined in Section II.B, supra, Metabolite elected to proceed on a termination

theory rather than alleging only partial breach. This choice opened the door to patent

infringement damages, and further permitted Metabolite to argue for damages including

expected post-judgment income.

> [I]f the breach has been such that the plaintiff has the right to treat the
> contract as absolutely and finally broken by the defendant, and he so elects
> to treat it, the damages are assessed as of a total breach of an entire
> contract. Such damages are not special or prospective damages, but are the
> damages naturally resulting from a total breach of the contract, and are
> suffered when the contract is broken, and are assessed as of that time.
> From the nature of the contract, they include damages for not performing

the contract in the future, as well as in the past.

Pierce v. Tenn. Coal, Iron, & R.R. Co., 173 U.S. 1, 12 (1899). Adopting this theory, the New Jersey Supreme Court has held that a party who elects to proceed on a partial breach theory may recover damages from the date of the breach through trial (as well as injunctive relief), or "he could treat the breach as total and seek recovery of one lump sum representing the present value of the monetary benefits he could have received over his expectancy." Stopford v. Boonton Molding Co., 265 A.2d 657, 667 (N.J. 1970).[3] New Jersey law does not bar future lost-profits damages; it merely requires that damages be proven with "reasonable certainty." Perini Corp. v. Greate Bay Hotel & Casino, Inc., 610 A.2d 364, 379 (N.J. 1992), abrogated on other grounds by Tertina Printing, Inc. v. Fitzpatrick & Assocs., Inc., 640 A.2d 788, 789 (N.J. 1994).

The jury instructions accurately relayed this standard. They stated that a successful breach of contract plaintiff "is entitled to compensatory damages for such losses as may fairly be considered to have arisen naturally from defendant's breach of contract. Alternatively, Metabolite may be entitled to such damages as may reasonably be supposed to have been contemplated by both parties at the time they made the contract as the probable result of the breach of such contract." At the time of trial, Metabolite knew when the '658 patent would expire and had a lengthy history of royalty payments.

---

[3] Although these authorities refer to the entire contract being terminated, the question we consider is whether the entire contract with respect to the homocysteine-only test was terminated.

-14-

Although Metabolite chose not to extrapolate those figures over a post-judgment, pre-expiration timeframe, it certainly had a full and fair opportunity to do so.[4]

**D**

Finally, Metabolite spends the bulk of its briefing arguing that the License Agreement could not have been terminated under the facts presented to the jury in the first trial. It claims that LabCorp's breach did not terminate the contract because several of the termination provisions were not satisfied, that Metabolite did not formally exercise a right to terminate the contract, and that the parties' post-verdict conduct is inconsistent with termination. But these are simply arguments that the jury was incorrect in the first case. Collateral estoppel prevents us from reexamining the wisdom of the prior determination. Even if we viewed Metabolite's arguments as entirely persuasive, Metabolite would still be bound by the jury's finding, upheld by the Federal Circuit, that the License Agreement was terminated with respect to the homocysteine-only assay. See Metabolite Labs., Inc., 370 F.3d at 1370. "Ultimately, in allowing collateral estoppel, courts have decided that the occasional permanent encapsulation of a wrong result is a

---

[4] In a somewhat related vein, Metabolite also argues that the License Agreement was never "[l]awfully" terminated with respect to the homocysteine-only assay. But the wrongfulness of the termination was the basis for the jury's award of expectation damages in the first action. See Stopford, 265 A.2d at 667. Had the contract been terminated pursuant to the provisions allowing for termination, there would be no grounds to award any damages. And because Metabolite had a full and fair opportunity to seek all of its expectation damages in the first case, the alleged unlawfulness of the original termination has no bearing on the estoppel effect of the jury's finding that the License Agreement was terminated with respect to the homocysteine-only assay.

price worth paying to promote the worthy goals of ending disputes and avoiding repetitive litigation." Sec. Exch. Comm'n v. Monarch Funding Corp., 192 F.3d 295, 304 (2d Cir. 1999) (quotation omitted).

We further note that the striking similarity between the arguments advanced by Metabolite in this case and those advanced by LabCorp in the prior action renders estoppel particularly appropriate. For example, on appeal to the Federal Circuit in the first case, LabCorp quoted section 4.02 of the License Agreement and argued that although "LabCorp advised Metabolite that it would not pay royalties on the Abbott single homocysteine test . . . LabCorp did not give notice to Metabolite that it was terminating the Agreement with respect to any Licensed Assay." Metabolite now quotes the very same portion of the License Agreement and claims that "LabCorp made no effort to comply with the termination requirements of Section 4.02." But Metabolite convinced the jury and the Federal Circuit that the License Agreement was terminated with respect to the homocysteine-only assay the first time around, see Metabolite Labs., Inc., 370 F.3d at 1370, and cannot now be heard to argue the opposite proposition. New Hampshire v. Maine, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . .") (quotation

omitted).[5]

We recognize the apparent disconnect between the Federal Circuit's conclusion that "a material breach . . . constitutes termination" and the authority it cites, which stands for the proposition that a material breach provides the non-breaching party a right to terminate. See Ross-Simons of Warwick, 217 F.3d at 11 (material breach "gives the other party a right to terminate"); Apex Pool Equip., 419 F.2d at 562 (same); Restatement (Second) of Contracts § 237 (same). However, neither the propriety of the Federal Circuit's conclusion nor the question of whether the agreement was terminated is properly before this court.

## III

Because the License Agreement was terminated with respect to the homocysteine-only assay, and Metabolite was already awarded expectation damages for that termination in the first action, we agree with the district court that LabCorp was not obligated by the

---

[5] Metabolite, citing the same language from New Hampshire, makes its own argument for estoppel in light of LabCorp's arguments during a post-verdict hearing regarding the injunction. LabCorp stated that Metabolite would have "additional claims for relief" for post-verdict damages if Metabolite won its appeal before the Federal Circuit. When the district court stayed the injunction, LabCorp was required to create a letter of credit to pay potential future damages. Metabolite contends that these actions demonstrate that it is entitled to post-verdict damages and that LabCorp is estopped from making arguments to the contrary. However, LabCorp's change in its position was occasioned by the success of Metabolite's argument. A loser in one suit is permitted to adopt the winner's position in a future suit. Hartley v. Mentor Corp., 869 F.2d 1469, 1475 (Fed. Cir. 1989) ("There could be no possible affront to the . . . court by [the losing party] adopting the position in a second suit which that court held was correct."). Further, the stipulated stay order explicitly disclaimed any prejudice in favor of either party's claims.

-17-

License Agreement to pay Metabolite royalties based on conduct subsequent to the first

judgment.  Accordingly, the judgment of the district court is **AFFIRMED**.


Entered for the Court


Carlos F. Lucero
Circuit Judge